**Dr. James A. SHAER, M.D., Appellee**

v.

**ORTHOPAEDIC SURGEONS OF CENTRAL PENNSYLVANIA, LTD., Appellant.**

Superior Court of Pennsylvania.

Argued Aug. 28, 2007.

Filed Dec. 10, 2007.

---

Thomas G. Collins, Harrisburg, for appellant.

Steven E. Grubb, Harrisburg, for appellee.

BEFORE: LALLY–GREEN, DANIELS and JOHNSON, JJ.

OPINION BY DANIELS, J.:

¶ 1 This is an appeal of the lower court's rulings on cross-motions for summary judgment that were filed by the parties to this action. For the following reasons, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

### FACTS AND PROCEDURAL BACKGROUND

¶ 2 Appellant, Orthopaedic Surgeons of Central Pennsylvania, Ltd. (OSCP), employed Appellee and Cross–Appellant, Dr. James A. Shaer, M.D., pursuant to an "Amended and Restated Employment Agreement" (Original Agreement) that was dated January 1, 2004, and was to expire on December 31, 2004. Prior to the expiration of the Original Agreement, OSCP decided to offer Dr. Shaer a partnership and the parties agreed to extend the Original Agreement by one month so that they would have enough time to arrive at a new agreement. That document was titled "First Amendment to Amended and Restated Employment Agreement" (Extension Agreement); it was dated January 1, 2005, signed by Appellee, Dr. Shaer, and

Craig W. Fultz, the President of OSCP, and was to be effective through January 31, 2005. In pertinent part, the Extension Agreement provided that:

In the event the parties elect to renew this Agreement for the One Month Extension Term, the Employee [Dr. Shaer] agrees to provide final notice to the Corporation [OSCP] of his intent to sign the then-current draft of the new employment agreement submitted by the Corporation by January 17, 2005. In the event that the Employee [does] not meet this notice deadline, the Corporation shall immediately withdraw its new employment agreement and shall notify its patients of the Employee's departure from the Corporation.

Extension Agreement, pp. 2–3.

¶ 3 The parties thereafter continued their negotiations in an effort to reach a new understanding. In furtherance of that effort, Kim Deiter, OSCP's Practice Administrator, served as the "go-between" for the parties during the negotiations. At the perceived culmination of the negotiations, Ms. Deiter personally delivered a draft of the so-called "Amended and Restated Employment Agreement" (Draft Agreement) to Dr. Shaer on Friday, January 14, 2005. It was Ms. Deiter's understanding that this Draft Agreement represented OSCP's "final offer" to Dr. Shaer. (*See* Deposition of Kim Deiter, 10/26/95, pp. 59–60). In her deposition, Ms. Deiter later explained that when she met personally with Dr. Shaer on that date, she attempted to discuss some of the salary and expense provisions[1] of the Draft Agreement with Dr. Shaer at that time, but that Dr. Shaer verbally rejected the Draft Agreement and tried to hand the document back to her. (*Id.*, p. 54).

¶ 4 Ms. Deiter testified that she took Dr. Shaer's initial reaction to be a "knee-jerk" response; moreover, she did not accept the document when Dr. Shaer tried to hand it back to her. She testified that she gave it back to him, told him to take the weekend to think it over, and added that whatever Dr. Shaer decided to do, OSCP needed his response in writing. (*Id.*, p. 55). According to Ms. Deiter, however, Dr. Shaer apparently did not take the weekend to think it over. She testified that Dr. Shaer called her later that same day (Friday, January 14, 2005) to further discuss the matter. According to Ms. Deiter, the conversation went as follows:

He said that he reviewed the contract. He wanted three changes, and then he would sign the contract. He wanted the $18,000 salary per month guaranteed[,] ... revisions to the prepaid [expenses] section, and ... agreement on his adjustment to salary, that everybody had to agree to that. I told him that I would present his counteroffer to the board of directors and get back to him. (*Id.*, p. 56).

¶ 5 Ms. Deiter apparently did not have an opportunity to present Dr. Shaer's "counteroffer" to the board at that late time of the day on Friday, January 14, 2005, but she planned to present it to the board as soon as possible on the following Monday, January 17, 2005. (*Id.*, p. 56).

¶ 6 On the morning of January 17, 2005, as Ms. Deiter recalled in her deposition testimony, Dr. Shaer called Ms. Deiter and announced that:

A: [H]e revisited the contract and he indicated that the three items he no longer wanted that on the table, and that he wasn't going to sign the

---

1. Ms. Deiter testified that this provision dealt with expenses such as malpractice insurance and conferences, which OSCP paid for its physicians on an annual basis. (Deiter Deposition, p. 84).

contract, and that he planned on resigning. I asked him if he was sure that's what he wanted to do. He said yes....I told him that I needed his resignation in writing, and that I needed to go back to the board and tell them of his resignation, but [would] ask them if they would extend his amendment for 60 days based on his concerns [regarding his patients who had surgeries pending].

Q: Did he actually use the words "I'm leaving the practice"?

A: Yes, he did.

Q: Did he use the word "resignation"?

A: Yes. I'm positive he used the word "resignation." (*Id.*, pp. 60–61 (quotation marks added for clarity)).

¶ 7 As noted above, Ms. Deiter testified that she had made clear to Dr. Shaer that she needed his final decision in writing. The record reflects, however, that Dr. Shaer had not submitted a resignation letter as of January 17, 2005, nor did OSCP send Dr. Shaer a letter by that date asking him to confirm his resignation. (*Id.*, p. 63). At that point in time on January 17, 2005, Ms. Deiter took Dr. Shaer's proposed sixty-day extension proposal to the board members, each of whom voted against it. (*Id.*, p. 63). Ms. Deiter testified that she left this information as a message for Dr. Shaer and reiterated that message to him when he returned her call later that afternoon. At that point, Dr. Shaer had apparently changed his mind and responded that "okay, he would sign the contract, but he [still] wanted the prepayment clause out of it, and that he was

resigning. He was going to give us a 60–day notice." (*Id.*, p. 65).

¶ 8 Ms. Deiter recalls that she next told Dr. Shaer that her understanding was that the "original 2004 contract led me to believe that he had to give a 90–day notice." [2] (*Id.*, p. 65). In Ms. Deiter's view:

He said fine. At that time, he was upset.... But I told him at that point in time, that there was no contract and, therefore, I didn't think that we had to accept him reinstating the contract and then terming [sic] because there was no meeting of the minds between the two groups. So based on my non-legal understanding, the contract was off the table because of the fact that he had verbally told me that he was resigning.

\* \* \*

I just didn't feel that there was a contract on the table, because the doctors [board members] said this is it. They wouldn't agree to an extension, the extension of the amendment, so there wasn't really a contract there to even discuss. (*Id.*, pp. 65–66, 67).

¶ 9 After these exchanges, but still on Monday, January 17, 2005, Dr. Shaer apparently crossed out his previously proposed changes, signed the January 14, 2005 Draft Agreement, and requested that Ms. Deiter pick it up, which she did. (*Id.*, p. 75). Even though Ms. Deiter picked up the document on the afternoon of January 17, 2005, she testified that it was still her understanding, as of that time, that "whatever [Dr. Shaer] signed and provided, the board was not going to accept." (*Id.*, p. 89).

¶ 10 On the very next day, January 18, 2005, Ms. Deiter showed the signed docu-

---

**2.** In fact, all three agreement documents here include the same notice provision language within the section entitled "Termination": "This Agreement may be terminated by either party without cause by providing at least ninety (90) days prior written notice (the "Notice Period") of the party's intent to terminate." Original Agreement, p. 7, Extension Agreement, p. 1, Draft Agreement, p. 8.

ment to Dr. Fultz, OSCP's president, and also faxed it to OSCP's legal counsel. (*Id.,* p. 89). Later that same day, OSCP hand-delivered to Dr. Shaer a letter signed by Dr. Fultz, the gist of which was to the effect that the negotiations had broken down, that Dr. Shaer's expressed plan of signing the new employment agreement (while at the same time tendering his resignation and giving his 90–day notice) was not in consonance with OSCP's intent in offering Dr. Shaer a new contract. The letter also announced that OSCP "no longer wishes to pursue negotiations on a new employment agreement with you and your employment with OSCP will expire as of January 31, 2005." [3] (Correspondence from OSCP to Dr. Shaer, 1/18/05).

¶ 11 Thereafter, on May 13, 2005, Dr. Shaer filed a complaint in the court below, alleging a breach of contract due to OSCP's refusal to provide him with ninety days of full salary and benefits upon his termination of employment. He also included a claim for damages, including costs and attorney fees, pursuant to the Pennsylvania Wage Payment and Collection Law (WPCL).[4] Thereafter, on March 3, 2006, Dr. Shaer filed a motion for summary judgment in the court below on the issue of liability regarding his allegations of breach of contract and also on the issue of his claims pursuant to the WPCL.

¶ 12 In an "Opinion and Order of Court" dated June 2, 2006, the lower court (1) granted summary judgment in favor of Dr. Shaer on his breach of contract claim and (2) denied Dr. Shaer's motion for summary judgment as to his claim under the WPCL. Lower Court's Opinion, 6/2/06, pp. 10–11. On September 22, 2006, OSCP filed its own motion for summary judgment, seeking to have Dr. Shaer's claim under the WPCL formally dismissed. On November 20, 2006, the lower court issued an order (1) granting OSCP's motion for summary judgment, (2) dismissing Dr. Shaer's claim under the WPCL, and (3) dismissing Dr. Shaer's claims for attorneys' fees and costs, which were dependant upon the claim under the WPCL. The court also declared its order to be final and appealable as to all claims between the parties. During December 2006, both sides appealed to this court, presenting assignments of error that will be addressed in turn.

### DISCUSSION

¶ 13 Our standard of review of a lower court's grant of a motion for summary judgment is well-settled:

> Our standard of review is the same as that of the trial court; thus, we determine whether the record documents a question of material fact concerning an element of the claim or defense at issue. If no such question appears, the court must then determine whether the moving party is entitled to judgment on the basis of substantive law. Conversely, if a question of material fact is apparent, the court must defer the question for consideration of a jury and deny the motion for summary judgment. We will reverse the resulting order only where it is established that the court committed an error of law or clearly abused its discretion.

*Souder v. Rite Aid Corp.,* 911 A.2d 506, 507 (Pa.Super.2006).

---

**3.** This would have been the expiration date of the Extension Agreement, which, as noted above, had been signed in order to give the parties an additional month to come to terms on a new contract for the future.

**4.** 43 P.S. § 260.1–260.45.

## I. *Appeal of Orthopaedic Surgeons of Central Pennsylvania, Ltd.*

¶ 14 OSCP presents the following questions for our appellate review:

1. Whether the trial court erred in concluding that Dr. Shaer had a valid and enforceable contract with OSCP as a matter of law where several factual disputes clearly existed?

2. Whether the trial court erred as a matter of law in granting summary judgment in favor of Dr. Shaer on his breach of contract claim where the trial court concluded that Dr. Shaer had a valid and enforceable contract with OSCP despite the fact that OSCP presented genuine issues of material fact with regard to the enforceability of the same?

OSCP Brief, p. 4.

¶ 15 Both of these assignments of error depend on the same underlying question: Whether the lower court was correct in concluding that a valid and enforceable new employment contract was formed between Dr. Shaer and OSCP on January 17, 2005? If so, OSCP was required to provide Dr. Shaer with ninety days' notice upon its decision to terminate him, rather than the thirteen days' notice—between January 18, 2005 and January 31, 2005—as OSCP attempted to do through its letter of January 18, 2005.

¶ 16 The lower court examined the wording and terms of the January 1, 2005 Extension Agreement, the Draft Agreement of January 14, 2005, and the undisputed fact that after Dr. Shaer's attempts to amend the Draft Agreement, he relented and signed the (unamended) Draft Agreement on January 17, 2005, as was required by the terms of that Extension Agreement. The lower court concluded, from its review of those documents and facts, that the contract was not ambiguous and that despite Dr. Shaer's verbal inter-actions with Ms. Deiter and his threats to resign, when he eventually did sign the Draft Agreement on January 17, 2005 and returned it to OSCP, he accepted the terms of OSCP's offer in writing and in a timely manner, and that he did so in precisely the manner as set forth in the Extension Agreement itself, which was the contract in place prior to January 17, 2005. Lower Court Opinion, p. 8.

¶ 17 The lower court thereupon concluded that:

> Nothing in the extension agreement prohibited [Dr. Shaer] from posturing (even to the point of resigning) in order to try to obtain a better offer. When [Dr. Shaer] was unable to do so, then, under the terms of the extension agreement, he signed [the] then current draft of a new employment agreement on January 17, 2005, and delivered it to [OSCP] without change. Accordingly, the offer of employment in that draft was accepted in the manner provided for in the extension agreement.
>
> * * *
>
> Since defendant offered and plaintiff accepted [the] then current draft of the new employment agreement pursuant to the terms of the extension agreement, the extrinsic oral evidence offered by defendant is not relevant because the contract principles defendant relies on [presumably, Dr. Shaer's threats to resign] were not applicable under the terms of the extension agreement.

Lower Court Opinion, pp. 8–9.

¶ 18 As noted above, once the trial court found that a contract existed, it also found that OSCP breached that contract through its January 18, 2005 letter, which attempted to terminate Shaer's employment, salary, and benefits as of January 31, 2005, rather than honoring the ninety-day period provided for and memorialized in the newly-formed agreement (formerly the Draft Agreement). Lower Court Opinion, p. 9.

¶ 19 OSCP asserts that the trial court's reasoning unfairly binds OSCP to the letter of its contract regardless of Dr. Shaer's "intervening counteroffers, rejection, and outright resignation of employment." OSCP Brief, p. 15. At the least, OSCP contends, there were ambiguities in the Extension Agreement as to whether the language in question governed the date and manner of Dr. Shaer's actual acceptance, which was required to be in writing, or merely the manner in which Dr. Shaer was required to express his intent to accept or reject the Draft Agreement, which could be verbal.

¶ 20 OSCP also refers to the Restatement (Second) of Contracts § 36, which provides that an offeree's power of acceptance may be terminated by rejection or by a counteroffer that materially alters the terms of the offer.[5] OSCP Brief, pp. 18–19. Thus, OSCP asserts that once Dr. Shaer informed Ms. Deiter, on Friday, January 14, 2005, that he wanted changes and/or that he would resign his employment from OSCP, his power to accept the Draft Agreement in its original form was terminated, and that he could not thereafter revive or reactivate it by unilaterally accepting the Draft Agreement by signature on January 17, 2005, as he did. OSCP Brief, p. 19. According to OSCP, Dr. Shaer's unilateral execution and delivery of the Draft Agreement on January 17, 2005 amounted to a new offer, which OSCP was free to reject, and did reject by its letter of January 18, 2005. OSCP Brief, pp. 24–25.

¶ 21 OSCP relies upon our decision in *Yarnall v. Almy*, 703 A.2d 535 (Pa.Su-per.1997), as support for the long-settled proposition (based on Restatement (Second) of Contracts § 36) that "a reply which purports to accept an offer, but instead changes the terms of the offer, is not an acceptance, but, rather, is a counter-offer, which has the effect of terminating the original offer." *Yarnall*, 703 A.2d at 538–39. We note, however, that in *Yarnall*, the application of that Restatement rule was in the context of a right of first refusal in connection with a sale of property; within that context, we found "no evidence of an 'unconditional and absolute' acceptance...." *Yarnall*, 703 A.2d at 539. Here, despite Dr. Shaer's "posturing," (to use the lower court's choice of words), Dr. Shaer did eventually present OSCP with his unconditional and absolute acceptance of their offer and did so both within the required time and in the required manner. We conclude, therefore, that the lower court committed no error of law in finding a valid and enforceable contract existed here. We also conclude that the lower court committed no error in finding that no genuine issues of material fact existed, and that Dr. Shaer was entitled to summary judgment as a matter of law on his breach of contract claim against OSCP. Thus, OSCP's assignments of error are without merit and the lower court's order granting summary judgment in favor of Dr. Shaer is affirmed, as is its award of the stipulated damages amount of $43,906.55 in favor of Dr. Shaer.

## II. *Appeal of Dr. James A. Shaer*

¶ 22 Dr. Shaer presents the following questions for our review in this appeal:

---

5. **§ 36. Methods of Termination of the Power of Acceptance.**

(1) An offeree's power of acceptance may be terminated by

(a) rejection or counter-offer by the offeree, or

(b) lapse of time, or

(c) revocation by the offeror, or

(d) death or incapacity of the offeror or offeree.

(2) In addition, an offeree's power of acceptance is terminated by the non-occurrence of any condition of acceptance under the terms of the offer.

1. Did the Lower Court Err in Denying Dr. Shaer Remedies Under Pennsylvania's Wage Payment and Collection Law where OSCP Withheld Wages and Benefits to Which Dr. Shaer was Contractually Entitled?

2. Did the Lower Court Err in Denying Dr. Shaer the Award of Costs, Including Attorneys' Fees, Under the Employment Contract Drafted by OSCP?

Shaer Brief, p. i.

■ ¶ 23 Dr. Shaer challenges the lower court's decision to grant summary judgment in favor of OSCP, which negated his claims for attorneys' fees and statutory liquidated damages, under either the WPCL or pursuant to the employment agreement at issue.[6] Shaer Brief, p. 9. The lower court's written reasons of June 2, 2006[7] explain that the WPCL is limited to claims by an employee when an employer has wrongly withheld wages due to the employee for work already performed by the employee. Lower Court Opinion, pp. 9–10. Thus, the lower court held that the WPCL remedies were not available to Dr. Shaer because this matter presented a post-termination context, where the wages in question were "not yet earned and or relating to periods after his termination." Lower Court Opinion, p. 10 (quoting *Allende v. Winter Fruit Distributors, Inc.,* 709 F.Supp. 597, 600 (E.D.Pa.1989)); *see also Weingrad v. Fischer & Porter Co.,* 47 Pa. D. & C.2d 244 (Pa.Com.Pl.1968). Adopting this reasoning, the lower court

denied Dr. Shaer's claim under the WPCL, which would have supplemented the nearly $44,000.00 he received as stipulated damages for the breach of contract claim. Lower Court Opinion, 6/2/06, pp. 9–10.

¶ 24 Dr. Shaer counters that the WPCL was intended to be broadly construed and applied so as to provide a vehicle for any employee "to enforce the payment of wages and compensation to which [the] employee is otherwise entitled by the terms of an agreement." Shaer Brief, p. 19 (quoting *Hartman v. Baker,* 766 A.2d 347, 352 (Pa.Super.2000)). Dr. Shaer also observes that the WPCL's statutory definition of covered "wages" includes "fringe benefits or wage supplements," defined as:

> *[S]eparation,* vacation, holiday, or *guaranteed pay;* reimbursement for expenses; union dues withheld from the employee's pay by the employer; and any other amount to be *paid pursuant to an agreement to the employee,* a third party or fund for the benefit of employees.

43 P.S. § 260.2a (emphasis added).

■ ¶ 25 Dr. Shaer further observes that the cases relied upon by the lower court in the rejection of his WPCL claim either do not apply here or are otherwise distinguishable from the current matter. Shaer Brief, p. 21. We agree. The WPCL was enacted "to provide employees a means of enforcing payment of wages and compensation withheld by an employer." *See Voracek v. Crown Castle USA*

---

6. 43 P.S. §§ 260.1–260.45. An award of liquidated damages would be "an amount equal to twenty-five percent (25%) of the total amount of wages due" as provided in Section 260.10. As for attorneys' fees, Section 260.9(a) mandates that "[t]he court in any action brought under this section shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow costs for reasonable attorneys' fees of any nature to be paid by the defendant."

7. These reasons were initially written to accompany the lower court's denial of Dr. Shaer's previous motion for summary judgment seeking recovery under the WPCL. The November 20, 2006 order (subject of this appeal) refers to the June 2, 2006 reasons for support.

*Inc.*, 907 A.2d 1105, 1109 (Pa.Super.2006). "Generally, the underlying purpose of the WPCL is to remove some of the obstacles employees face in litigation by providing them with a statutory remedy when an employer breaches its contractual obligation to pay wages. In essence, the primary goal of the WPCL is to make whole again [those] employees whose wages were wrongfully withheld by their employers." *Oberneder v. Link Computer Corp.*, 449 Pa.Super. 528, 674 A.2d 720, 722 (1996). Thus, to ensure that employees who are successful in their actions against an employer are made whole again, the statute mandates the award of attorneys' fees in addition to any judgment awarded to a plaintiff. *Id.*; 43 P.S. § 260.9a(f).

¶ 26 Although a number of WPCL cases are either federal, trial level, or unpublished, and, therefore, not controlling, there seems to be consensus among them that severance pay and other separation related contractual arrangements are indeed covered by the WPCL. *See Bowers v. NETI Tech., Inc.*, 690 F.Supp. 349 (E.D.Pa.1988) (severance pay and option to sell back stock options covered under WPCL definition of "wages"); *Barsky v. Beasley Mezzanine Holdings, L.L.C.*, 2004 WL 1921156 (E.D.Pa.2004) (unpublished memorandum) (contractual separation pay covered because distinguishable from claim for potential lost future earnings, which are not covered by WPCL); and *Goodyear v. Pa. Steel Foundry & Machine Co.*, 43 Pa. D. & C.4th 285 (Pa.Com.Pl.1999) (payments contracted for in employment and non-competition agreement deemed covered by WPCL because they are characterized as an incentive to work for defendant company and not as consideration for plaintiff's agreement not to compete).

¶ 27 Additionally, we note that here, according to the terms of the Draft Agreement, the ninety-day notice period was intended to benefit both parties. Regardless of who terminated the arrangement and whether or not it was amicable, the agreement dictates that Dr. Shaer would have been responsible—during the ninety-day notice period—for completing all scheduled office hours, all scheduled surgeries, and all scheduled on-call staffing assignments. Draft Agreement, Section 16.A.2(b), p. 9. In exchange for this additional service during this ninety-day period of time in question, Dr. Shaer would be guaranteed salary and benefits during the transitional time period. Thus, there was a contractual arrangement, and OSCP's breach of that contract led, in the language of the WPCL, to a wrongful withholding of an "amount to be paid pursuant to an agreement to the employee." 43 P.S. § 260.2a.

¶ 28 As such, Dr. Shaer has demonstrated that he is entitled to his remedies under the WPCL, primarily attorneys' fees. Consequently, we reverse that portion of the lower court's order that dismissed Dr. Shaer's claims under the WPCL, and remand to the lower court for proceedings consistent with this Memorandum. As we find that Dr. Shaer may recover attorneys' fees pursuant to the WPCL, we do not reach his additional claim for attorneys' fees on an independent basis, for to do so would provide him with a double recovery. Similarly, because Dr. Shaer was awarded interest by the lower court in its November 20, 2006 order, he is consequently not entitled to recover interest under the liquidated damages provision of the WPCL, as such would amount to "dual payment, or a windfall." *See Signora v. Liberty Travel, Inc.*, 886 A.2d 284 (Pa.Super.2005).

### *CONCLUSION*

¶ 29 In view of our prior discussion as to the appeal of OSCP (as Appellant) and the cross-appeal of Dr. Shaer (as Appellee and

Cross–Appellant), we hereby affirm that portion of the November 20, 2006 order of the lower court that granted summary judgment in favor of Dr. Shaer on his breach of contract claim; however, we reverse that portion of the lower court's said order of November 20, 2006 that denied summary judgment to Dr. Shaer as to his claim under the WPCL; we also reverse the order of the lower court granting summary judgment in favor of OSCP on Dr. Shaer's WPCL claim and remand for further proceedings below in that latter connection.

¶ 30 Order of November 20, 2006 affirmed in part and reversed in part in accordance with this opinion. Remanded for proceedings consistent with this opinion. Jurisdiction relinquished.

¶ 31 LALLY–GREEN, J. FILES A DISSENTING STATEMENT.

DISSENTING STATEMENT BY LALLY–GREEN, J.:

¶ 1 While the majority sets forth a persuasive rationale for its result, I respectfully dissent. The following principles of contract formation are well-settled:

> In order to form a contract, there must be an offer, acceptance, and consideration or mutual meeting of the minds. An alleged acceptance of an offer is not unconditional and, therefore, is not an acceptance if it materially alters the terms of the offer. As such, a reply which purports to accept an offer, but instead changes the terms of the offer, is not an acceptance, but, rather, is a counter-offer, which has the effect of terminating the original offer. Further, it is well established that the acceptance of any offer or counter-offer must be unconditional and absolute.

*Yarnall v. Almy,* 703 A.2d 535, 539 (Pa.Super.1997) (internal citations and quotation marks omitted); *see also GMH Assocs. v. The Prudential Realty Group,* 752 A.2d 889, 899 (Pa.Super.2000), *appeal denied,* 568 Pa. 663, 795 A.2d 976 (2000).

¶ 2 The record before us reflects that Dr. Shaer responded to OSCP's new contract offer with a counter-offer. At that point, OSCP's offer was terminated. *Yarnall.* The fact that Dr. Shaer later signed and returned the document to OSCP in the time and manner specified is of no moment, since the offer was already terminated. I would hold that since the parties did not form a new contract, the trial court committed an error of law in granting summary judgment to Dr. Shaer on his breach of contract claim.

¶ 3 Moreover, for the same reason, there is no basis for Dr. Shaer's WPCL claim. Summary judgment in favor of OSCP on Dr. Shaer's WPCL claim is therefore appropriate.

¶ 4 In light of the foregoing, I respectfully dissent.