J-A05020-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| SALUTATIONS, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PARADIES SHOPS, L.L.C., A LIMITED | : | |
| LIABILITY COMPANY, PARADIES | : | |
| HOLDINGS, LLC, A LIMITED | : | No. 957 WDA 2018 |
| LIABILITY COMPANY, THE PARADIES | : | |
| SHOPS, INC., A CORPORATION, THE | : | |
| PARADIES SHOPS, LLC, A LIMITED | : | |
| LIABILITY COMPANY, PARADIES- | : | |
| PITTSBURGH, LLC, A LIMITED | : | |
| LIABILITY COMPANY, PARADIES-PIT, | : | |
| LLC, A LIMITED LIABILITY COMPANY, | : | |
| GREGG PARADIES, AN INDIVIDUAL, | : | |
| JAMES PARADIES, AN INDIVIDUAL, | : | |
| RICHARD L. DICKSON, AN | : | |
| INDIVIDUAL, DON MAREK, AN | : | |
| INDIVIDUAL, AND KAREN LEACH | : | |
| SUTTLE, AN INDIVIDUAL | : | |
| | : | |
| Appellants | : | |

Appeal from the Order Entered June 4, 2018
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD-16-23964

BEFORE:  GANTMAN, P.J.E., SHOGAN, J., and MURRAY, J.

MEMORANDUM BY SHOGAN, J.:                    **FILED OCTOBER 29, 2019**

Appellants, Paradies Shops, L.L.C., *et al.*, appeal from the order overruling their preliminary objections seeking to compel arbitration in this civil matter brought by Appellee, Salutations, Inc.[1] We affirm.

Appellants are in the business of securing retail concession opportunities in public airports throughout the United States. Amended Complaint, 3/29/17, at ¶ 28. Pursuant to federal law, a certain percentage of concessions at publicly funded airports should include small business concerns owned and controlled by socially and economically disadvantaged individuals as defined in Section 47113(a) of Title 49 of the United States Code. 49 U.S.C. §§47107(e) and 47113(a). In 2001, Appellants reached an agreement with Pittsburgh International Airport's leasing company to become a concessionaire of at least seven shops at the airport, with the requirement that Appellants would do so with a disadvantaged partner. Amended Complaint, 3/29/17, at ¶ 52-53. As a possible partner, Appellants sought out Appellee, a local

---

[1] "As a general rule, an order [overruling] a party's preliminary objections is interlocutory and, thus, not appealable as of right." **Callan v. Oxford Land Development, Inc.**, 858 A.2d 1229, 1232 (Pa. Super. 2004). However, we note that the appeal, taken from an order denying a motion to compel arbitration in the form of a preliminary objection, is properly before us pursuant to Pa.R.C.P. 1028(a)(6) and Pa.R.A.P. 311(a)(8). **See also Midomo Company Inc. v. Presbyterian Housing Development Company**, 739 A.2d 180, 183 (Pa. Super. 1999) (holding an order denying the preliminary objections alleging alternative dispute resolution and requesting that the court order a party to arbitrate the dispute is an interlocutory order appealable as of right pursuant to Pa.R.A.P. 311(a)(8), Pa.R.C.P. 1028(a)(6), and 42 Pa.C.S. §§ 7342(a), 7320(a)(1), and 7304(a)). Therefore, this appeal is properly before this Court.

company owned by an African American. *Id*. at 56-57. Eventually, Appellee agreed to form a company with Appellants in exchange for twenty percent ownership interest in the enterprise, a management fee equal to one percent of the gross revenues, and a substantive managerial role in the operation. The parties executed an Operating Agreement with an effective date of April 26, 2001.

On December 8, 2016, Appellee filed a complaint raising seven counts. On February 6, 2017, Appellants filed preliminary objections attempting to compel arbitration as to the breach of contract claim. On March 29, 2017, Appellee filed an amended complaint raising eight counts. On May 3, 2017, Appellants filed second preliminary objections seeking to compel arbitration of all counts in the amended complaint based upon a provision in an unsigned management agreement. On June 8, 2017, Appellee filed preliminary objections and an answer alleging there was no legal basis upon which to compel arbitration. On June 30, 2017, Appellants filed amended preliminary objections.

The trial court held a hearing on May 15, 2018. On June 4, 2018, the trial court entered an order overruling Appellants' preliminary objections seeking arbitration. This timely appeal followed. The trial court did not order Appellants to file a Pa.R.A.P. 1925(b) statement. The trial court entered an order pursuant to Pa.R.A.P. 1925(a), indicating that the reasons for its decision are found in the June 4, 2018 opinion.

Appellants present the following issues for our review:

1. Did the trial court commit an error of law by overruling [Appellants'] Preliminary Objections and refusing to compel arbitration where there exists a valid, enforceable arbitration agreement between the parties?

1a. Did the trial court err by applying Pennsylvania law to interpret enforceability of the Management Agreement written under and incorporating Georgia law, including the arbitration provision contained therein?

1b. Did the trial court err by holding that the Management Agreement, and the arbitration provision contained therein, is unenforceable because that [sic] the Agreement is unsigned?

1c. Did the trial court err by failing to consider the signed Promissory Note that ratifies the Management Agreement by word, act, and course of conduct?

1d. Did the trial court err by holding that [Appellee's] conduct over the course of a 15-year period (during which time it assented to the essential terms of the Management Agreement) would result in only piecemeal ratification and not ratification of the Agreement *in toto*, including the arbitration provision?

1e. Did the trial court err by holding that Salutations' did not waive its right to enforce the provision in the parties' Operating Agreement requiring the written consent of at least eighty-one percent (81%) of the members holding an equity interest in Paradies-Pittsburgh prior to entering into the Management Agreement?

1f. Did the trial court err by failing to determine whether Salutations' claims against Paradies are within the scope of the arbitration provision in the Management Agreement?

Appellant's Brief at 5-6 (footnote omitted) (reordered for disposition).

First, we note appellate briefs must materially conform to the briefing requirements set forth in the Pennsylvania Rules of Appellate Procedure. Pursuant to Pa.R.A.P. 2101, when a party's brief fails to conform to the rules

of appellate procedure and the defects are substantial, an appellate court may, in its discretion, quash or dismiss the appeal. Pa.R.A.P. 2101.

Here, we observe that Appellants' brief does not comply with Pa.R.A.P. 2119, which provides, in pertinent part, as follows:

> **(a) General rule. The argument shall be divided into as many parts as there are questions to be argued**; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.

Pa.R.A.P. 2119(a) (emphasis added). The argument portion of Appellants' brief is not divided into as many parts as there are questions to be argued because the argument portion contains one main issue that is divided into eight distinctive subparts, yet Appellants list one main issue with six subparts in their "statement of the questions presented." Appellants' Brief at 5-6. Because each of the points raised by Appellants in the argument portion of their brief and each of the points presented in the "statement of the questions presented" essentially challenges whether the trial court properly overruled Appellants' preliminary objections, we will consider Appellants' claims. Thus, while these defects in Appellant's brief are significant, they do not preclude our review of this matter and we will proceed with our review.

Appellants first argue that Georgia law applies to determine the enforceability of the management agreement. Appellants' Brief at 17-20. Appellants contend that the trial court erred in concluding that Pennsylvania

law applies to the validity and enforcement of a management agreement and its arbitration clause. *Id*. at 17.

To determine whether Pennsylvania law or Georgia law applies to the current dispute, we apply Pennsylvania choice of law principles, which use a combination of the "government interest" analysis and the "significant relationship" approach of Section 145 of the Restatement (Second) of Conflicts. *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964). By using this hybrid test, courts can analyze "the policies and interests underlying the particular issue before the court." *Id.* Under Pennsylvania choice of law rules, we first look to see if the laws of the competing states actually differ. *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 702 (Pa. Super. 2000). If there is no conflict, the inquiry ends; Pennsylvania law applies. *Id*.

Choice of law analysis is limited to conflicts of substantive law. *Wilson v. Transport Ins. Co.*, 889 A.2d 563, 571 (Pa. Super. 2005). "Substantive law is the portion of the law which creates the rights and duties of the parties to a judicial proceeding, whereas procedural law is the set of rules which prescribe the steps by which the parties may have their respective rights and duties judicially enforced." *Ferraro v. McCarthy-Pascuzzo*, 777 A.2d 1128, 1137 (Pa. Super. 2001).

We begin by considering whether the laws of Pennsylvania and Georgia differ with regard to the validity and enforcement of the management

agreement and its arbitration clause. As Appellee aptly states, "[Appellants do] not argue, nor can [they], that an actual conflict exists." Appellee's Brief at 23 (citing Appellants' Brief at 18-19). Further, Appellee asserts that "no distinction exists between Pennsylvania law and Georgia law regarding the validity and enforceability of a purported agreement to arbitrate." Appellee's Brief at 22. In addition, the trial court reached the same conclusion, stating: "[The trial court] conclude[s] that there is no material or meaningful substantive distinction between the law of Pennsylvania and the law of Georgia with respect to the contested issues between the parties, including the question of the arbitrability of their disagreements." Trial Court Opinion, 6/4/18, at 2.

Our review reflects that Appellants concede there is no conflict. In their appellate brief, Appellants state, "[E]ven if Pennsylvania law were applicable, the outcome remains the same, as both Georgia and Pennsylvania law concur that [Appellee's] claims for management fees in this case are arbitrable as a matter of law." Appellants' Brief at 17-18. Because the parties have neither identified nor established any conflict between the laws of Pennsylvania and the laws of Georgia in this matter, we decline to engage in a choice of law analysis. Hence, we will apply Pennsylvania law in determining the issues presented herein.

The remainder of Appellants' arguments purport to prove the existence of a management agreement between the parties, which included an

arbitration provision. Appellants contend that the management agreement, along with its arbitration clause, is enforceable despite the fact that the document was not signed. Appellants' Brief at 22-25. Appellants claim the fact that there is no signed management agreement is of no moment because Appellee's "assent [to the terms of the agreement] was unequivocally manifested through words and conduct, and the fact that the Management Agreement is unsigned is inconsequential to its enforceability." *Id*. at 23.

Our review of the denial of the petition to compel arbitration "is limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion in denying the petition." *Pisano v. Extendicare Homes, Inc.*, 77 A.3d 651, 654 (Pa. Super. 2013). The party alleging the existence of a valid arbitration agreement has the burden of proof on that issue. *Washburn v. Northern Health Facilities, Inc.*, 121 A.3d 1008 (Pa. Super. 2015). We apply a two-part test. "First, we examine whether a valid agreement to arbitrate exists. Second, we must determine whether the dispute is within the scope of the agreement." *Pisano*, 77 A.3d at 654-655.

Since arbitration is a matter of contract, a party cannot be compelled to arbitrate unless he or his agent have agreed to do so. *Bair v. Manor Care of Elizabethtown, PA, LLC*, 108 A.3d 94 (Pa. Super. 2015). "Whether an agreement to arbitrate disputes exists is a question of law." *Neuhard v. Travelers Ins. Co.*, 831 A.2d 602, 604 (Pa. Super. 2003). Thus, our standard

of review is limited to determining whether the trial court committed an error of law and our scope of review is plenary. ***McNulty v. H&R Block, Inc.***, 843 A.2d 1267, 1271 (Pa. Super. 2004).

In addition, "arbitration agreements are to be strictly construed and not extended by implication." ***Fellerman v. PECO Energy Co.***, 159 A.3d 22, 26-27 (Pa. Super. 2017). "When parties have agreed to arbitrate in a clear and unmistakable manner, every reasonable effort should be made to favor the agreement unless it may be said with positive assurance that the arbitration clause involved is not susceptible to an interpretation that covers the asserted dispute." ***Id***.

However, "[b]efore a contract can be found, all of the essential elements of the contract must exist." ***Johnston the Florist, Inc. v. TEDCO Constr. Corp.***, 657 A.2d 511, 516 (Pa. Super. 1995). "It is black letter law that in order to form an enforceable contract, there must be an offer, acceptance, consideration, or mutual meeting of the minds." ***Walton v. Johnson***, 66 A.3d 782, 786 n.3 (Pa. Super. 2013) (citation omitted).

> The question whether an undisputed set of facts establishes a contract is a matter of law. Because contract interpretation is a question of law, this court is not bound by the trial court's interpretation. An offer may be accepted by conduct and what the parties do pursuant to the offer is germane to show whether the offer is accepted. Furthermore, it is a basic principle of the law of contracts that an acceptance must be unconditional and absolute. Whether particular conduct expresses an offer and acceptance must be determined on the basis of what a reasonable person in the position of the parties would be led to understand by such conduct under all of the surrounding circumstances.

***Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.***, 764

A.2d 587, 593 (Pa. Super. 2000) (citations and quotation marks omitted).

> An alleged acceptance of an offer is not unconditional and, therefore, is not an "acceptance" if it materially alters the terms of the offer. As such, a reply which purports to accept an offer, but instead changes the terms of the offer, is not an acceptance, but, rather, is a counter-offer, which has the effect of terminating the original offer. Further, it is well established that the acceptance of any offer or counter-offer must be "unconditional and absolute."

***Yarnall v. Almy***, 703 A.2d 535, 538-539 (Pa. Super. 1997) (citations

omitted). In addition, an offeree's power of acceptance may be terminated

by rejection or by a counteroffer that materially alters the terms of the offer.

***Shaer v. Orthopaedic Surgeons of Cent. Pa., LTD.***, 938 A.2d 457, 463 n.5

(Pa. Super. 2007).

Our review of the certified record reflects that Appellants have failed to

present a signed document reflecting an agreement to arbitrate. Instead, the

record reveals that Appellants appended to their preliminary objections filed

on February 6, 2017, an **unsigned** copy of a management agreement

between the parties. Preliminary Objections, 2/6/17, Exhibit B. This

management agreement contains an arbitration provision.[2] ***Id***. at 8, § 8.8.

---

[2] The arbitration provision consists of the following language:

> 8.8. <u>Arbitration; Sole Remedy</u>. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled only by arbitration in Atlanta, Georgia in accordance with the Commercial Arbitration Rules of the American Arbitration

In his deposition testimony, Andre L. Young, the sole owner of Appellee, testified that when presented with this particular management agreement Mr. Young and his attorney, Edward J. Kabala, rejected it. Young Deposition, 2/12/18, at 76-78. Mr. Young explained that he had never signed the document or agreed to its terms. *Id*. at 174-175. In addition, Mr. Young stated that "[a]fter [the management agreement] was rejected, it was never mentioned again, never brought up again." *Id*. at 78. Likewise, Mr. Kabala testified that the management agreement was among the documents rejected in a letter sent July 19, 2001, from Mr. Kabala to Richard L. Dickson, an officer of the entities comprising Appellees. Kabala Deposition, 3/20/18, at 68-71.

Furthermore, it is undisputed that, although Appellee rejected the management agreement, the parties subsequently signed an Operating

---

Association ("AAA"). The arbitrator shall be selected by agreement of the parties or, if they cannot agree on an arbitrator within thirty (30) days after the notice of such party's desire to have the question settled by arbitration, then the arbitrator shall be selected by the AAA. The determination reached in such arbitration shall be final and binding on all parties hereto without any right of appeal or further dispute. Execution of the determination by such arbitrator may be sought in any court of competent jurisdiction. Unless otherwise agreed by the parties, any such arbitration shall be conducted in accordance with the rules of the AAA. The party not prevailing in arbitration shall bear all of the costs (including attorneys' fees and expenses) of each party participating in the arbitration[.]

Preliminary Objections, 2/6/17, Exhibit B, at 8, § 8.8 (emphasis in original).

Agreement with an effective date of April 26, 2001. The Operating Agreement does not contain an arbitration clause.

Our review also reveals that in May of 2010, Appellee received another proposed management agreement from Appellants, Young Deposition, Exhibit 19, which Appellee also refused to sign. Young Deposition, 2/12/18, at 167-170. Mr. Young stated that he did not sign the management agreement he received because "[t]hey had terms in them that we didn't agree with." *Id*. at 169. Mr. Young indicated that he rejected the document in a May 2010 conversation with Don Marek, the vice-president of finance for all of the Paradies entities. *Id*. at 51-53.

In their preliminary objections to Appellee's amended complaint filed May 3, 2017, Appellants presented a copy of yet another unsigned management agreement. Preliminary Objections, 5/3/17, Exhibit B. This document also contains an arbitration provision, which consisted of the exact language as the provision appearing in the prior management agreement appended to the earlier preliminary objections. *Id*. at 9, § 8.8. In his deposition testimony, Mr. Young expressed that he had never seen a copy of the management agreement appended to Appellants' preliminary objections to Appellee's amended complaint until Appellants filed the document on May 3, 2017. Young Deposition, 2/12/18, at 172. Specifically, the following transpired during Mr. Young's deposition testimony:

Q. Mr. Young, I'm showing you what we've marked as Deposition Exhibit No. 20, and I apologize for the size of the document, but

I'll represent to you that this is the document that was filed on May 3, 2017, by the [Appellants] in this litigation and the document is entitled [Appellants'] Preliminary Objections to [Appellee's] First Amended Complaint Raising Issues of Fact. Do you see that?

A. Yes.

Q. The last roughly ten pages of the document, of Exhibit 20 --

* * *

Q. -- contain a document bearing the caption Management Agreement. See if you can get to that page.

* * *

Q. Okay. So this is a document that's attached to [Appellants'] Preliminary Objections to [Appellee's] First Amended Complaint Raising Issues of Fact filed on May 3, 2017. Do you see that?

A. Yes.

Q. Now, the document has a title on the first page called Management Agreement. Do you see that?

A. Yes.

Q. And then it has -- in the first line it has some language. It says, "Is made and entered into as of the 26th day of April, 2001." Do you --

A. Yes.

Q. -- see that language?

A. Yes.

Q. Okay. When was the first time that you ever saw that document which is attached to Deposition Exhibit 20 filed on May 3, 2017?

A. On May the 17th when we received this, when I received this.

Q. When I sent that to you

A. Yes, when you sent this to me.

Q. -- after they filed it?

A. Yes. That's the first time I've seen that document.

Q. Was a copy of this document attached to Deposition Exhibit 20 filed on May 3, 2017, was a copy of that document in any of your files prior to the filing of this lawsuit?

A. No.

Q. Did you ever sign the document attached to Deposition Exhibit 20?

A. No.

Q. Did you ever agree to the terms of the document attached to Deposition Exhibit 20?

A. No.

Young Deposition, 2/12/18, at 170-173.

Ultimately, Mr. Young testified that he never entered into any agreement with Appellants that would require disputes to be arbitrated in Georgia:

Q. Mr. Young, have you ever agreed to or signed any document with any of [Appellants] in which Salutations agreed to arbitrate disputes in the state of Georgia?

A. No.

Q. Did you ever enter into any oral agreement with any of [Appellants] to arbitrate disputes in the state of Georgia?

A. No.

*Id*. at 175-176.

In light of the facts set forth above, we conclude that Appellee never accepted or entered into any management agreement with Appellants that would have compelled arbitration. As the trial court aptly stated, "the lack of the existence of a signed written agreement incorporating an arbitration clause is ultimately fatal to [Appellants'] demand for arbitration." Trial Court Opinion, 6/4/18, at 2. Indeed, not only are the management agreements contained in the record unsigned by either party, there is specific testimony from Mr. Young that he rejected the two proposed management agreements that were offered to him, and the third management agreement appended to Appellants' second set of preliminary objections was never presented to Mr. Young. Hence, we discern no abuse of discretion by the trial court.

In order to circumvent the fact that they failed to present evidence of a signed management agreement compelling arbitration, Appellants next argue that a promissory note pertaining to a subsequent loan to Appellee is evidence of ratification of the management agreement. Appellants' Brief at 25-31. Appellants assert that, by signing a promissory note on December 4, 2006, Appellee ratified the management agreement. *Id*. at 26-28.

We have long noted that "[r]atification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Evans v. Ruth*, 195 A. 163, 165 (Pa. Super. 1937). Thus, this area of the law pertains to contracts undertaken by an agent

- 15 -

on behalf of a principal. Such is not the case in this matter, as there was no agent performing acts on behalf of Appellee. Rather, as discussed in detail above, the record reflects that when presented with two different management agreements Appellee specifically rejected each of those documents.

In addition, our review of the record reveals a significant defect in Appellants' claim that the signing of a promissory note somehow triggered ratification of the management agreement. Initially, we observe that the "Maker" of the promissory note is "Andre Young," personally, and not Appellee. Amended Preliminary Objections, Exhibit C, at 1. In fact, Appellee's corporate name does not appear anywhere in the promissory note.[3] Moreover, because the promissory note fails to ascribe a date to a referenced "management agreement," Appellants have failed to specify which of the multiple management agreements was allegedly ratified by the promissory note. Indeed, we note that the term "management agreement" appears twice in the promissory note in the following paragraph:

_____

[3] The promissory note specifies the following:

> For value received, the undersigned, **ANDRE YOUNG** (Maker) promises to pay to the order of The Paradies Shops, Inc. (Holder) at 5950 Fulton Industrial Boulevard, S.W., Atlanta, Georgia 30336 or such other place as Holder may designate to Holder in writing, the principal sum of **TWENTY FIVE THOUSAND** ($25,000.00).

Amended Preliminary Objections, Exhibit C, at 1 (emphasis in original).

A monthly payment of principal shall be paid on the thirtieth (30th) day of each month (the last day of the month for February) commencing on January 31, 2006 and continuing until the loan is repaid in full. The monthly amount to be paid to the Holder will be 50% of the monthly management fees due to Maker under the management agreement between Paradies-Pittsburgh, LLC, and various parties including the Maker and Holder. All management fees due to Maker will be deemed paid to the Maker in satisfaction of the obligations under the Management Agreement, but 50% of the management fees shall be paid to the Holder and credited towards payment of the principal due under this loan agreement. Monthly installments of principal not paid when due shall bear interest at a rate of 12% per annum until paid.

Amended Preliminary Objections, Exhibit C, at 1. We cannot agree that these two vague references to a management agreement are sufficient to overturn Appellee's specific rejection of the management agreements presented to it.

Moreover, we note that the loan document does not contain an arbitration clause. Rather, the promissory note states the following:

The undersigned expressly consents to personal jurisdiction and venue in any court of competent jurisdiction in Fulton County, Georgia, in any action which, in whole or in part, seeks to enforce or collect the indebtedness evidenced by this Note.

Amended Preliminary Objections, Exhibit C, at 3. This language conflicts with the suggestion that, by signing the promissory note, Appellee ratified any management agreement containing a provision that would compel arbitration. Consequently, Appellants' claim that the signing of a promissory note acted as a ratification of a management agreement lacks merit.

Appellants next argue that the trial court erred in holding that Appellee's conduct over the course of fifteen years did not result in ratification of the management agreement, *in toto*. Appellants' Brief at 31-50. Appellants

contend that Appellee assented to the terms of the management agreement through its course of conduct, *i.e.*, by accepting management fees and in remaining silent and never questioning references to a management agreement. ***Id***. at 35-50.

The trial court addressed this claim by Appellants as follows:

> Moreover, to the extent [Appellants] attempt to avail themselves of the argument that [Appellee] ratified the proffered (though unsigned) management agreement, including its arbitration provision, through [Appellee's] many years of conduct consistent with the work scope and compensation elements of the management agreement, such conduct cannot properly be deemed to ratify the otherwise unacted upon arbitration provisions in the proffered management agreement. The [c]ourt appreciates and understands the arguments regarding [Appellee's] conduct respecting scope of work and compensation. . . . However, [Appellants] point to no conduct of [Appellee] from which this [c]ourt can reasonably infer [Appellee] waived any objection to, consented to, or ratified the management agreement in toto. Indeed, there exists no competent evidence that any authorized individual ever received or reviewed any proffered management agreement that was not explicitly rejected.

Trial Court Opinion, 6/4/18, at 2-3.

Upon review of the certified record, we are constrained to agree with the trial court's determination. As discussed above, Appellants presented Appellee with two proposed management agreements, and Appellee specifically rejected both documents. The record further reveals that Appellants did not present Appellee with additional management agreements. Accordingly, we cannot conclude that any conduct by Appellee could overcome the outright rejection of the only two management agreements set before it.

Hence, it is our determination that the trial court did not abuse its discretion in this regard.

Moreover, to the extent that Appellants argue that Appellee's acceptance of the payment of management fees is an assent to the terms and conditions of a written management agreement, Appellants ignore the fact that the parties verbally agreed to the details of the payment of management fees at the outset of their negotiations. With regard to a meeting that occurred in August of 2001, Mr. Young testified as follows:

> And at that particular time Dick Dickson reiterated the fact that we will be getting $60,000 from the management fee that was entered into and -- and there would be a 20 percent/80 percent partnership as we agreed to, and that **the management fee will be paid at 1 percent to the minority partner and 4 percent to the majority partner based upon the ownership interest.**

Young Deposition, 2/12/18, at 160 (emphasis added). Likewise, Mr. Dickson testified that the percentage of ownership and division of management fees was agreed to "from day one." Specifically, the following transpired at Mr. Dickson's deposition:

> Q Did you during the visit in the store, did you discuss with [Mr. Young] the 80/20 ownership of the enterprise?
>
> * * *
>
> A There wouldn't be -- there wouldn't be any purpose for discussing 80/20. He knew it was 80/20. There's no discussion. There's no discussion to have. I mean **the 80/20 was agreed to from day one to, you know, whatever**. There was nothing to discuss. The confusion part, that's all -- that was always there.

Q **And the 80/20 you're referring to both the ownership percentages and you're also referring to the split of the management fees; right**?

A **Sure**.

Q Okay. And you're saying **that was agreed to from day one**?

A **Sure**.

Dickson Deposition, 2/23/18, at 52-53 (emphases added). Thus, the record belies Appellants' claim that the management fees were paid to Appellee in accordance with a written management agreement. Consequently, Appellee's acceptance of the payments is not an assent to the terms of a written management agreement.

Appellants also argue that the trial court erred in holding that Appellee did not waive its right to enforce a provision of the parties' Operating Agreement. Appellants' Brief at 51-53. Specifically, Appellants assert that the provision of the operating agreement that required the written consent of eighty-one percent of the members to enter into a management agreement was waived by Appellee through its course of conduct. *Id*. at 53.

It is undisputed that the Operating Agreement entered into by the parties is binding. It is apparent that the Operating Agreement lacks any arbitration clause. In addition, the Operating Agreement reflects that the parties had not entered into a management agreement. The following language manifests that fact:

4.3 *Limitation on Powers of Directors and President.* **The authority of the Directors and the President** under this Agreement **shall be limited as follows**:

> 4.3.1. **Without the written consent by Members holding eighty-one percent (81%) or more of the Equity Interests, neither the President nor the Directors shall have authority to**:
>
> > (n) **Enter into**, change, amend or terminate **the Management Agreement intended to be entered into by the Company and The Paradies Shops, Inc. ("TPS") and Salutations, Inc. ("Salutations")** or any other agreement between the Company and either TPS, Paradies Shops, LLC ("PSLLC") and/or Salutations or an affiliate of either TPS, PSLLC or Salutations

Operating Agreement, at 13-14, § 4.3.1(n) (bold emphases added).  Indeed, this language is indicative of the fact that the parties had not entered into a management agreement at the time of the execution of the Operating Agreement.  In addition, this language expresses that no management agreement may be entered into without the written consent of members holding eighty-one percent of the equity interest.  It is further undisputed that Appellee holds a twenty percent equity interest.  Consequently, a management agreement would require the written consent of Appellee.  The record before us lacks any verification of written consent by the parties to enter into a management agreement.  As discussed *supra*, there is no merit to the claims that Appellee's conduct over the course of time indicated consent to enter into the management agreements proposed by Appellants.  Likewise,

there is no indication that Appellee waived the requirements set forth in the Operating Agreement, which were necessary in order to enter into a valid management agreement. Therefore, Appellants' claim lacks merit.

Appellants last argue that the trial court erred in failing to determine whether Appellee's claims against Appellants are within the scope of the arbitration clause in the management agreement. Appellants' Brief at 53-56. Appellants assert that, because the arbitration provision in the management agreement is binding, the trial court should have conducted an analysis to determine whether Appellee's claims fall within the scope of the arbitration clause. *Id*. at 53-54.

Because a valid agreement to arbitrate did not exist between the parties, the trial court did not err in refusing to consider whether Appellee's claims against Appellants fall within the scope of the purported arbitration clause. Moreover, based on this conclusion, we do not need to address Appellants' claim that the arbitration agreement encompassed Appellee's claims.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/29/2019