SOUTHEASTERN PENNSYLVANIA SYNOD OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA

v.

**Stanley MEENA and Judith Gotwald and Evangelical Lutheran Church of the Redeemer a/k/a Redeemer Lutheran Church, Appellants.**

Commonwealth Court of Pennsylvania.

Argued Feb. 9, 2011.

Decided April 18, 2011.

J. Stephen Woodside, Norristown, for appellant Stanley Meena.

John I. Gordon, Lafayette Hill, for appellee.

BEFORE: LEADBETTER, President Judge, and PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge, and BUTLER, Judge.

OPINION BY Judge PELLEGRINI.

Stanley Meena, Judith Gotwald,[1] and The Evangelical Lutheran Church of the Redeemer (collectively, Redeemer) appeal from orders of the Court of Common Pleas of Philadelphia County (trial court) granting a motion for summary judgment filed by Southeastern Pennsylvania Synod (Synod) of the Evangelical Lutheran Church in America (ELCA), denying Redeemer's cross-motion for summary judgment and dismissing Redeemer's counterclaim against Synod.

Redeemer was incorporated in 1891 as a Pennsylvania non-profit religious corporation with its own constitution and bylaws. It owns property at the corner of Midvale Avenue and Conrad Street in the East Falls section of Philadelphia consisting of a church building and annex. The ELCA is a national church which is divided into 65 different synods in nine geographic regions of the United States. Each synod coordinates the work of the ELCA's congregations within its region and bears the responsibility of carrying out the Lutheran church's mission. The Southeastern Pennsylvania Synod, incorporated in Pennsylvania as a religious organization under its own articles of incorporation and constitu-

---

1. Stanley Meena served as President and Judith Gotwald served as Secretary and/or Vice–President of the Congregation Council of The Evangelical Lutheran Church of the Redeemer.

tion, is corporately interdependent with the ELCA, forming a hierarchical church structure. According to Redeemer's constitution, it is a member of this hierarchical structure and is subject to the discipline of both Synod and the ELCA. Bishop Claire Burkat (Bishop Burkat) serves as both the chief ecumenical officer and President of Synod with the responsibility for ministry of Synod and its congregations, including Redeemer. Synod's constitution provides for oversight of its congregations, including their ongoing viability, as Section 13.24 states:

> If any congregation of this synod is disbanded, or if the members of a congregation agree that it is no longer possible for it to function as such, or if it is the opinion of the Synod Council that the membership of a congregation has become so scattered or so diminished in numbers as to make it impractical for such congregation to fulfill the purposes for which it was organized or that it is necessary for this synod to protect the congregation's property from waste and deterioration, the Synod Council, itself or through trustees appointed by it, may take charge and control of the property of the congregation to hold, manage, and convey the same on behalf of this synod. The congregation shall have the right to appeal the decision to the Synod Assembly.

In 2007, Synod Council assessed the fragile status of Redeemer, including its diminished attendance records, income and expense figures, and approved a resolution authorizing Bishop Burkat to take Redeemer under involuntary synodical administration in accordance with Section 13.24 of the Synod Constitution. On October 11, 2007, Bishop Burkat wrote to Redeemer's congregation announcing Synod's action placing Redeemer under involuntary synodical administration and requesting an immediate meeting with the congregation.

Bishop Burkat met with Redeemer council members and four trustees on November 7, 2007, after which Redeemer delivered to Synod a list of church materials and documents.

On February 12, 2008, Bishop Burkat wrote to Redeemer's church council, notifying it that Redeemer would be closed and that all business must immediately cease. Council members were told that they no longer had authority to conduct church business on behalf of the congregation, and they must refrain from holding themselves out as church council. In addition, Bishop Burkat instructed council members to turn over the keys to the church as well as all bank records, administrative and financial documents and they should cooperate with Synod to wind down church affairs. That same day, Bishop Burkat also wrote to Redeemer's congregation stating that involuntary synodical administration was in place because the fragile economic situation and low membership made it unlikely that Redeemer's congregation could continue to carry out its stated mission and fulfill its purpose. Bishop Burkat's letter also stated that Redeemer's church council no longer had any authority within the congregation and that the trustees appointed by Synod Council would take charge of Redeemer's property.

Upon arrival at Redeemer's property on February 24, 2008, for a meeting with Redeemer's congregation, Bishop Burkat and the trustees found the church doors were locked. They were informed they would not be welcomed into the church, and if they did not leave Redeemer's property, the police would be contacted. Redeemer asserted that Synod had no right to take charge and control of its property. In June 2008, Redeemer's congregation held a meeting with approximately 12

members in attendance, at which time the congregation members voted unanimously to appeal Synod Council's decision to impose involuntary synodical administration.[2]

Section 7.01 of the Synod Constitution states, "[t]his Synod shall have Synod Assembly, which shall be its highest legislative authority. The powers of the Synod Assembly are limited only by the provisions in the Articles of Incorporation, this constitution and bylaws, the assembly's own resolutions, and the constitution and bylaws of the [ELCA]." (Reproduced Record (R.R.) at 105a). Synod held its annual meeting on May 8 and 9, 2009, during which Synod Assembly approved by majority vote the procedure to hear Redeemer's appeal. After presentation of the matter by members of Redeemer and the trustees, a majority of the Synod Assembly voted to affirm the decision of Synod Council to invoke Section 13.24, take charge and control of the property of Redeemer, and to hold, manage, and convey the same on behalf of Synod.

On June 9, 2008, Synod filed a complaint for declaratory relief against Redeemer seeking an order declaring that synodical administration was in effect, that Synod was the trustee of Redeemer, and directing Redeemer to deliver all of its keys, books, records, and financial assets to Synod. Synod alleged that Meena, Gotwald and Redeemer refused to comply with the imposition of synodical administration and conspired to take over Redeemer's congregation and its assets in violation of ecclesiastic laws, Redeemer's own constitution and the governing documents of the ELCA. According to Synod, the decision to impose synodical administration on Redeemer was a matter of internal church governance made pursuant to the church's constitution by Synod Council, the appropriate ecclesiastical body, and it was appealed to Synod Assembly, the highest judicatory body in Synod. Synod argued that it was not the function of a civil court to make such internal ecclesiastical decisions and that decisions of a church hierarchy were binding in all cases of ecclesiastical cognizance, subject only to the appeals the church itself provided. After the pleadings were closed, both parties filed motions for summary judgment and the trial court heard oral argument.

On September 25, 2009, the trial court issued an order granting Synod's motion for summary judgment and ordering Redeemer, *inter alia*, to deliver to Synod all of the keys to its buildings as well as all of its books, records and financial assets.[3] In its opinion issued pursuant to Pa. R.A.P. 1925(b), the trial court noted that it considered the "neutral principles of law" approach in this matter, which states that "in cases where the resolution of a property dispute involves no inquiry into ecclesiastical questions, courts of this Commonwealth are to apply the same principles of law as would be applied to non-religious

2. Redeemer also commenced an action against Synod in the trial court challenging Synod's authority to close Redeemer and take charge and control of its property. In this litigation, Redeemer sought an injunction to keep Synod from imposing involuntary synodical administration. However, the trial court found that the core of Redeemer's complaint did not concern the neutral principles of law surrounding property ownership. Rather, it determined that the property question was the result of Synod's decision to impose synodical administration and its internal criteria for making such a decision. The trial court held it would be improper to inquire into this decision because the controversy involved a matter of the internal governance or administration of a religious association; therefore, the court dismissed Redeemer's complaint.

3. On September 28, 2009, the trial court issued a supplemental order denying Redeemer's cross-motion for summary judgment and dismissing its counterclaim against Synod.

associations." *Presbytery of Beaver–Butler v. Middlesex Presbyterian Church,* 507 Pa. 255, 266, 489 A.2d 1317, 1323 (1985), *cert. denied* 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985). However, the trial court noted that this case involved a core question of church discipline and internal governance. Synod Council decided to impose involuntary synodical administration and shut down Redeemer because its congregation had become so diminished in numbers or so scattered "as to make it impractical for such congregation to fulfill the purposes for which it was organized." Redeemer appealed this decision to the Synod Assembly, the highest judicatory body of Synod, which affirmed the decision. The trial court determined that the neutral principles of law approach did not apply, stating:

> A decision that a congregation can no longer fulfill the purposes for which it was organized is a doctrinal one that does not involve a "neutral principles" of law approach. For this Court to analyze whether Synod's action was improper would require inquiry into the criteria Synod used when it decided to close the congregation.

(Trial court decision at 7). The trial court stated that whenever questions of discipline, faith, or ecclesiastical law, rule or custom have been decided by the highest church judicatory, legal tribunals must ac-

cept these decisions as final and binding in their application to the case before them. *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 721, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). Because the Synod Assembly, the highest judicatory body of Synod, heard Redeemer's appeal and affirmed the decision to impose synodical administration, the trial court deferred to the church's resolution of the matter. This appeal followed.[4]

■ On appeal, Redeemer first argues that the trial court erred in holding that it lacked subject matter jurisdiction over the case. According to Redeemer, Synod's decision regarding who owns Redeemer's corporate property is not ecclesiastical in nature or a matter of internal church governance and, therefore, not binding on a civil court. Redeemer asserts that the property dispute involves questions of corporate and property law that can be determined without delving into doctrinal questions. Therefore, Redeemer maintains that the trial court should have accepted jurisdiction of the case and decided the issue under the neutral principles of law approach, and that it erred in refusing to do so. We disagree.

■ The Supreme Court of Pennsylvania has explained that when the resolution of a property dispute does not involve an inquiry into ecclesiastical questions,[5]

---

4. The issues before this Court are purely questions of law; therefore, our review is plenary. *In re: SEPTA MVFRL Interest Litigation,* 996 A.2d 1099, 1102 n. 2 (Pa.Cmwlth.2010). In general, summary judgment is only proper when, after examining the record in the light most favorable to the non-moving party, the record clearly demonstrates that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Manley v. Fitzgerald,* 997 A.2d 1235, 1238 n. 2 (Pa.Cmwlth.2010).

5. It should also be noted that with respect to ecclesiastical government, our courts have

recognized three categories of church polity in the United States, as follows:

> (1) Prelatical, which includes the Roman Catholic and Russian Orthodox Churches in which each subordinate unit is controlled by an ascending order of individual dignitaries; (2) Denominational, which is typified by the ecclesiastical government of the Presbyterian Church, in which there are in regular succession, the Presbytery over the session or local church, The Synod over the Presbytery, and the General Assembly over all; and (3) Congregational, which includes, inter alia, the Baptists and the

courts of this Commonwealth are to apply the "neutral principles of law approach," meaning they must use the same principles of law as would be applied to non-religious associations. *Presbytery of Beaver–Butler v. Middlesex Presbyterian Church,* 507 Pa. 255, 489 A.2d 1317 (1985). "[T]his approach 'relies exclusively on objective, well-established concepts of trust and property law' by requiring courts to resolve property disputes according to the terms of a governing statute, the property deed, and any other document that expresses the parties' intentions regarding the ownership of the property." *In re: Church of St. James the Less,* 585 Pa. 428, 444, 888 A.2d 795, 805 (2005). *See also Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969).

■ However, as evidenced by its name, the "neutral principles of law approach" applies *only* when a trial court is able to determine the underlying issue by utilizing purely legal principles without delving into ecclesiastical matters. This is due to First Amendment concerns because the Establishment Clause's command to "make no law respecting an establishment of religion," U.S. Const. amend. I, prohibits all forms of governmental action, including court action through civil lawsuits. *See Kreshik v. St. Nicholas Cathedral,* 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960) (per curiam). Therefore, for over a century the United States Supreme Court has sanctioned the use of the polity or deference approach, which states:

[W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom,

Churches of God, in which the prevailing rule is complete autonomy and independence of denominational authority in the local congregation.

or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Serbian Eastern Orthodox,* 426 U.S. at 710, 96 S.Ct. 2372 (citing *Watson v. Jones,* 13 Wall. 679, 20 L.Ed. 666 (1872)). The deference approach seeks to avoid the danger of government entanglement with religion because our courts have acknowledged that "First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Presbytery of Beaver–Butler,* 507 Pa. at 262, 489 A.2d at 1321. In addition:

If the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws ... [a]nd would, in effect, transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions.

*Serbian Eastern Orthodox,* 426 U.S. at 714, 96 S.Ct. 2372 (quoting *Watson,* 13 Wall. at 733–34).

Contrary to Redeemer's assertions, the main issue in this case is not a property

*Pilgrim Holiness Church v. Pilgrim Holiness Church of Athens Township,* 436 Pa. 239, 242, 259 A.2d 870, 872 n. 2 (1969). Cases involving the ELCA, including the present case, fall within the second category.

dispute that can be determined under neutral principles of law. The controversy surrounds Synod's decision to impose involuntary synodical administration on Redeemer and close the church's doors. The Synod Assembly determined that given such factors as Redeemer's financial situation and diminished congregation numbers, it was no longer able to fulfill the purposes for which it was organized and carry on the church's mission. This decision ultimately resulted in Synod taking control of Redeemer's property pursuant to Section 13.24 of Synod's constitution. To review Synod's decision to impose synodical administration, the trial court would have to examine the internal processes and criteria utilized by Synod and the Synod Assembly to determine the on-going viability of their congregations. We agree with the trial court that this decision concerns ecclesiastical matters regarding internal church governance and organization beyond the purview of our courts.

This case is similar to that of *Trinity Lutheran Evangelical Church v. May*, 112 Pa.Cmwlth. 557, 537 A.2d 38 (1988). In that case, a division arose within an Evangelical church's congregation due to the actions of its pastor. *Id.* at 40. The Western Pennsylvania–West Virginia Synod (WPWVS) formed a committee to investigate the problems and attempt to reunite the congregations, but the factions could not agree. *Id.* The executive board of the WPWVS adopted a resolution declaring the congregation defunct and ordering it, pursuant to the constitution of the Lutheran Church in America, to turn over all of

its property to the WPWVS. *Id.* The congregation refused to comply and the WPWVS filed a complaint in equity requesting an injunction, which was ultimately granted. *Id.* at 40–41. This Court noted the following:

[T]he decision to declare the church defunct was based, at least in substantial part, on the board's determination that Trinity failed to maintain its operations "according to the tenets and usages of the Lutheran Church." A determination that a congregation has failed to maintain its operation in accordance with the tenets of the church is a doctrinal one which does not involve application of "neutral principles" of law. Accordingly, our court is bound by that determination.

*Id.* at 44.

While we ultimately vacated the order granting the injunction in *Trinity* because the record failed to indicate whether the WPWVS followed its own rules and procedures in making its determination to close the church, our evaluation of the underlying issue is instructive. In *Trinity*, the WPWVS decided to shut down one of its congregations because it failed to maintain its operation in accordance with the tenets of the church. Similarly, in the present case, Synod Council decided to impose involuntary synodical administration and close Redeemer's doors because it could no longer fulfill the purposes for which it was organized. Decisions regarding the ongoing viability of a congregation and whether or not to permanently shut a church's doors are clearly ecclesiastical matters.[6]

---

6. *See also Serbian Eastern Orthodox*, 426 U.S. at 698, 96 S.Ct. 2372 (holding that the decision of the Holy Synod of the Serbian Orthodox Church and its highest judicatory authority to reorganize one of its dioceses into three separate dioceses was a matter of ecclesiastical cognizance and polity binding upon the civil courts); *Canovaro v. Brothers of Order of*

*Hermits of St. Augustine*, 326 Pa. 76, 84, 191 A. 140, 145 (1937) (stating that "[d]ivision, dismemberment, or suppression of parishes, and the effect thereof on membership are purely ecclesiastical matters, dependent upon the church law as administered by the appropriate authorities and tribunals"). While these cases involve different categories of

The present case has one key distinction from *Trinity*, that being that Synod clearly followed its own rules and procedures in making the ultimate determination to impose synodical administration and shut down Redeemer. Redeemer appealed to Synod Assembly, the highest judicatory body within Synod, which affirmed the decision. Given the deference approach and prior court decisions, we will not delve into the religious thicket and attempt to substitute our own judgment regarding ecclesiastical matters for that of the Synod Assembly.

▬ Redeemer also argues that the constitutional provision under which Redeemer's property was conveyed is contrary to Synod's own articles of incorporation, which it claims prohibit Synod from taking any action towards Redeemer's corporate property without its consent. Redeemer specifically relies on a provision of Article II, which provides as follows:

> In the performance of its functions [to promote the Christian religion according to tenets of faith established by the ELCA], [Synod] shall not act as the agent of, or otherwise obligate the income or assets of the [ELCA], any congregation of the [ELCA] or any other synod of the [ELCA] without the express authorization of such entity.

(R.R. at 27a). According to Redeemer, the articles also limit Synod Council's powers, as Article VI states, the "powers, authorities, and duties of the members of Synod Council ... and such other regulations with respect to them as are not inconsistent with the express provisions of these Articles of Incorporation shall be specified from time to time in [its constitution]." (R.R. at 28a). Redeemer also argues that it never acceded or agreed to Section 13.24

of Synod's constitution and this provision is not part of Redeemer's own constitution. As such, Redeemer argues that Synod's articles of incorporation control the disposition of this case and mandate that Synod lacks the authority to control or convey Redeemer's property or assets.

However, Redeemer's argument fails to acknowledge the hierarchical structure of the ELCA and the controlling provisions of Redeemer's own constitution. According to its constitution, Redeemer is a member of the hierarchical structure of the Lutheran church, subject to the discipline of both Synod and the ELCA. Section C6.01 of Redeemer's constitution states, "[t]his congregation shall be an interdependent part of the [ELCA] or its successor, and of the [Synod]." (R.R. at 147a). Redeemer's constitution also contemplates potential property issues resulting from its disorganization as Section C7.01 states, "[i]f this congregation ceases to exist, title to undisposed property shall pass to the [Synod]." (R.R. at 148a). Redeemer's argument that Synod lacked the power to control or convey Redeemer property because Redeemer did not consent is unavailing. Section 13.24 of Synod's constitution specifically provides a mechanism for taking charge and control of a congregation's property if it is disbanded, can no longer function as a congregation, or it becomes impractical to fulfill the purposes for which it was organized. Contrary to Redeemer's argument, Article II of Synod's articles of incorporation does not contradict this constitutional provision. In addition, Redeemer's voluntary act of uniting with Synod and the ELCA subjects it to the government of the general church. *See In re: Church of St. James the Less*, 585 Pa. at 443, 888 A.2d at 804; *Serbian Eastern*

---

church polity than the one at issue in the present case, they are persuasive in that they both hold that a decision to divide or shut

down a congregation is an ecclesiastical matter binding upon the civil courts.

*Orthodox,* 426 U.S. at 711, 96 S.Ct. 2372; *Canovaro,* 326 Pa. at 84, 191 A. at 145.

For all of the foregoing reasons, the decisions of the trial court are affirmed.

Judge BROBSON concurs in the result only.

### ORDER

AND NOW, this 18th day of April, 2011, the decisions of the Court of Common Pleas of Philadelphia County, dated September 25, 2009, and September 28, 2009, are affirmed.

### DISSENTING OPINION BY Judge LEAVITT.

I respectfully dissent. The majority holds that the Synod's decision to close Redeemer and take control of its property was an ecclesiastical matter over which the courts lack jurisdiction. However, the validity of the Synod's action turns on a question of corporate governance that can be decided under neutral principles of Pennsylvania corporation law. Specifically, Redeemer contends that the Synod's action was *ultra vires* because it was not authorized by the Synod's Articles of Incorporation. I would remand that question to the trial court for disposition.

The Synod has adopted a bylaw that authorizes the Synod Council to take control of the property of a congregation under certain circumstances. Section 13.24 provides:

> If any congregation of this synod is disbanded, or if the members of a congregation agree that it is no longer possible for it to function as such, *or if it is the opinion of the Synod Council that the membership of a congregation has become so scattered or so diminished in numbers as to make it impractical for such congregation to fulfill the purposes for which it was organized* or that it is

necessary for this synod to protect the congregation's property from waste and deterioration, *the Synod Council,* itself or through trustees appointed by it, *may take charge and control of the property of the congregation* to hold, manage, and convey the same on behalf of this synod. The congregation shall have the right to appeal the decision to the Synod Assembly.

Constitution, Bylaws, and Continuing Resolutions of the Southeastern Pennsylvania Synod Evangelical Lutheran Church in America, § 13.24; Reproduced Record at 129 (R.R. ——) (emphasis added). The Synod's Articles of Incorporation state:

> In the performance of its functions, this corporation shall not act as the agent of, or otherwise obligate the income or assets of the ELCA, *any congregation of the ELCA* or any other synod of the ELCA *without the express authorization of such entity.*

R.R. 001 (emphasis added). Redeemer argues that Section 13.24 exceeds the Synod's corporate authority, which does not allow the Synod to "take charge and control of the property" of a congregation without the approval of the congregation.

Under Pennsylvania law, the Articles of Incorporation trump any inconsistent provision in the corporate bylaws. Specifically, both the Pennsylvania Business Corporation Law of 1988, 15 Pa.C.S. §§ 1101–4162, 1504(a), and the Pennsylvania Nonprofit Corporation Law of 1988, 15 Pa.C.S. §§ 5101–6162, 5504(a), provide that the bylaws of a corporation must be *"not inconsistent with law or the articles"* (emphasis added). In *Dugan v. Firemen's Pension Fund of Philadelphia,* 372 Pa. 429, 434, 94 A.2d 353, 355 (1953), our Supreme Court held that the bylaws of a corporation must be consistent with the corporation's charter. In *March v. Fairmount Creamery Association,* 32 Pa.Super. 517, 520 (Pa.Super.1907), our Superior Court held that a

bylaw authorizing a forfeiture of vested property rights was invalid unless adopted pursuant to a power conferred by the corporate charter or statute.

Redeemer argues that the Synod's bylaw, *i.e.,* Section 13.24, is invalid and unenforceable. The trial court dismissed Redeemer's complaint for the stated reason that the case involved an inquiry into ecclesiastical matters of church discipline and internal governance, noting that the "thrust of the matter relates to Synod's internal decision to shut down Redeemer's congregation." Trial Court Opinion at 6. The majority affirms, reasoning that because Redeemer agreed to be bound by the Synod's bylaws, including Section 13.24, it cannot now complain. I disagree. In *Weiss v. Musical Mutual Protective Union,* 189 Pa. 446, 42 A. 118 (1899), our Supreme Court held that members of an incorporated union could not be bound by an illegal bylaw because they did not object at the time of its passage. A corporation's bylaw that is inconsistent with the corporation's articles of incorporation is *ultra vires* and void, even where it was unanimously assented to by its members. *Dugan,* 372 Pa. at 437, 94 A.2d at 356 (Musmanno, J., dissenting on other grounds) (quoting 18 Corpus Juris Secundum, Corporations, § 189).[1]

Whether Section 13.24 of the Synod's bylaws is *ultra vires* and beyond the Synod's corporate charter is not an ecclesiastical matter dealing with doctrinal questions or church governance. It presents purely a question of corporate law that can be resolved under Commonwealth laws. *Presbytery of Beaver–Butler v. Middlesex Presbyterian Church,* 507 Pa. 255, 266, 489 A.2d 1317, 1323 (1985) (holding that in cases where the resolution of a property dispute between members of a religious association involves no inquiry into ecclesiastical questions, courts of the Commonwealth are to apply the same principles of law as would apply to nonreligious associations). That is precisely the case here.[2]

For these reasons, I would reverse the trial court's decision to dismiss the complaint and remand the matter to the trial court to consider whether the Synod's bylaw is illegal as contrary to its Articles of Incorporation.

Judge McCULLOUGH joins in this dissenting opinion.

---

1. In *In Re: Church of St. James The Less,* 585 Pa. 428, 448, 888 A.2d 795, 807–808 (2005), our Supreme Court noted that the member of a voluntary association is bound only by rules that are duly enacted and do not deprive the member of vested property rights without the member's consent.

2. As an aside, I disagree with the majority that Redeemer made itself part of a hierarchical organization, *i.e.,* the Evangelical Lutheran Church in America. The governing documents describe the relationship as interdependent. Nor is this a case like *In Re: Church of St. James The Less,* where Episcopal churches affiliated with the National Episcopal Church hold property in trust for the national church and the diocese.