IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: New Central Baptist :
Church, Non Profit Organization : No. 1079 C.D. 2022
: Submitted: October 10, 2023
Appeal of: New Central Baptist :
Church :

BEFORE:   HONORABLE ANNE E. COVEY, Judge
          HONORABLE LORI A. DUMAS, Judge
          HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE DUMAS                                    FILED:  March 22, 2024

New Central Baptist Church (Church) appeals from the decree entered in the Court of Common Pleas of Philadelphia County, Orphans' Court Division (orphans' court), which invalidated the votes (1) electing trustees at two Church elections and (2) removing Church's pastor.  On appeal, Church challenges the orphans' court reasoning.  We vacate and remand for further proceedings.

## I. BACKGROUND[1]

Church was incorporated as a nonprofit organization and is subject to certain bylaws.[2]  Orphans' Ct. Op., 6/7/22, at 2.  For example, the Bylaws provide

---

[1] We state the facts as presented by the orphans' court opinion to the extent they "are supported by *competent and adequate* evidence."  *In re Est. of Plance*, 175 A.3d 249, 259 (Pa. 2017) (emphasis added).  "In determining whether the findings of the orphans' court are supported by competent evidence, we must take as true all the evidence supporting the findings and all reasonable inferences therefrom."  *Id.* (cleaned up).  Further, the orphans' court resolves credibility and any conflicts in testimony.  *Id.* at 259-60.  We also cite to the Pennsylvania Rule of Civil Procedure 236 notice dates.  The record does not reflect any challenge or objection to the accuracy of the trial transcripts.

The orphans' court, however, did not always cite to the record in support of its findings. *See id.*  Instead, the orphans' court occasionally quoted or paraphrased the parties' pleadings, which we discuss below.

[2] Precisely, Church is governed by a document titled "Constitution & By Laws."  Trial Ex. P-2 (Bylaws).  The Bylaws occasionally duplicated enumeration, *e.g.*, there are two Article II(C)

that trustees "are the legal representatives of the church," and "are elected annually by the church . . . ."[3]  Bylaws, at Art. II & II(C. Trustees).  The trustees "shall be elected by aye or nay except where declared to be otherwise (ballot, rising or show of hands)."  *Id.* at Art. VII(A).  The trustees' power "shall be exercised only by the majority voting, present at the church meeting."  *Id.* at Art. II(C. Trustees).[4]

As for church meetings, the Bylaws do not require a quorum for any non-business meeting.  *See generally id.*  For any business meeting, however, the Bylaws require a quorum of 40 people.[5]  *Id.* at Art. VIII(C).

Finally, as for terminating the employment of the pastor, the Bylaws provide that the "term of office may be ended upon ninety (90) days['] notice on the part of the Pastor or the Church."  *Id.* at Art. II(C. Termination of Pastorate).

In 2010, Church hired Reverend Bernard Reaves, Sr., as Church's pastor.  Orphans' Ct. Op. at 2.  In 2016, Church members "grew dissatisfied with the governance and management," which resulted in a disputed 2018 election of the trustees.  *Id.* at 2-3.  In August 2018, Church members convened and "purportedly elected" four members as trustees, which included Claudia Sherrod.  *Id.* at 3; N.T. Hr'g, 12/15/21, at 49-50.  Reverend Reaves disputed the election and claimed that the

___

sections: one addressing the term of office of the pastor and the other addressing trustees.  The Bylaws also refer to the Hiscox Guide for Baptist Churches and the Standard Manual for Baptist Churches "as its rule or order," but no party addressed those documents.  The Charter for Church also stated that the Charter complied with the existing law governing nonprofit corporations.  *See* Ex. P-1; *see also* Notes of Testimony (N.T.) Hr'g, 12/15/21, at 184 (moving all exhibits into evidence).

[3] The parties do not dispute that the term "church" appears to refer to the members of the church.

[4] Although the Bylaws state that trustees must be elected annually, the Bylaws also state that "as many trustees will be appointed as deemed necessary."  Bylaws, at Art. II(C. Trustees).  It appears the Bylaws may equate the term "appointed" with "elected."

[5] In its motion for reconsideration, Church asserted that "a quorum of 40 members would far exceed a majority of members and thus make it virtually impossible for a quorum to ever be reached and for any business to . . . be conducted."  Mot. for Reconsid., 1/3/22, at 6 n.1.

2

trustees instead consisted of only two other members: Maurice Brown and Michelle Martin. Orphans' Ct. Op. at 3.

The parties' dispute regarding the trustees impacted Church's control over its bank accounts. *Id.* After the disputed 2018 election, the newly elected trustees successfully requested the bank to add them and Church's deacons as authorized signers on the bank accounts. *Id.*; N.T. Hr'g, 12/15/21, at 50. That request was relatively short lived, as Brown allegedly visited the bank, removed them as authorized signers, and had the bank "designate himself and Michelle Martin as authorized signers . . . ." Orphans' Ct. Op. at 3;[6] *see also* N.T. Hr'g, 12/15/21, at 53.

In February 2019, Church members convened and voted to dismiss Reverend Reaves as the pastor. Orphans' Ct. Op. at 4. A few weeks later, the trustees and deacons purportedly ratified the members' termination vote. *See id.*[7] The parties dispute the legitimacy of the February 2019 vote. Church believes Reverend Reaves was terminated as pastor but "has continued to receive" a Church salary. *Id.*

In July 2019, the trustees and deacons notified Reverend Reaves of the

---

[6] Brown did not testify that he visited the bank and removed the trustees. *See* N.T. Hr'g, 12/15/21, at 184-93. As noted herein, the orphans' court did not always cite to the evidence of record in support of its findings. Instead, the orphans' court apparently restated an allegation in Church's petition. *Compare* Orphans' Ct. Op. at 3 ("During January 2019, Respondent, Maurice Brown, visited PNC Bank and had PNC Bank to [sic] designate himself and Michelle Martin as authorized signers for [Church's] bank accounts and to [sic] remove the Trustees and Deacons as authorized signers."), *with* Pet., 1/22/20, ¶ 22 ("[O]n or around January 2019, Brown visited PNC Bank and convinced PNC Bank to designate himself and Martin as authorized signers for [Church's] bank accounts and to remove the Trustees and Deacons as authorized signers.").

[7] The orphans' court did not cite to any evidence of record in support of this finding. *Compare* Orphans' Ct. Op. at 4 ("On March 11, 2019, the Trustees and Deacons jointly approved and ratified the membership's vote to terminate Reverend Reaves as pastor of [Church]."), *with* Pet., 1/22/20, ¶ 33 ("On March 11, 2019, the Trustees and Deacons jointly approved and ratified the membership's vote to terminate Rev. Reaves as pastor of the Church."). *See generally* N.T. Hr'g, 12/15/21 to 12/16/21 (reflecting no corroborative testimony about joint approval and ratification); Reaves Resp. to Interrog., 12/3/21, ¶ 18 (responding "Yes" to the interrogatory about whether the March 11, 2019 vote was invalid).

3

upcoming annual election of the trustees.[8]  *Id.*  The parties dispute whether all Church members were properly notified of the upcoming election.  *Id.*  In August 2019, the members reelected the four members they had voted for in August 2018.  *Id.*  Reverend Reaves again disputed the results of this election.  *Id.*

Church filed a petition in orphans' court requesting a decree validating, *inter alia*, (1) the August 2018 and 2019 elections and votes for the trustees; and (2) the February 2019 votes removing Reverend Reaves as the pastor.  Pet. for Citation, 1/22/20, ¶ 58; Pet. for Reissuance of Citation, 6/30/20, ¶ 15; *accord* Church's Br. at 43.  The orphans' court held a trial.

In relevant part, Sherrod testified that a quorum of members was present at the August 2018 trustee election.  N.T. Hr'g, 12/15/21, at 45.  Sherrod was asked "approximately how many members were required to reach a quorum," and she responded: "Eight."  *Id.* at 45, 91 (stating that eight "votes are needed to elect or reject a trustee"); *see also id.* at 136 (reflecting another witness's testimony that a quorum was present at the 2018 election); *id.* at 169 (same).[9]

In response to the question of "how many active members . . . were eligible" to vote, Sherrod responded "[w]e had about 26 or 27 people and we had 3 absentee ballots."  *Id.* at 45, 90; *accord* Ex. P-9 (reflecting 26 members on the "sign-in sheet" for the August 2018 trustees' election).  But of the three absentee ballots, one person came to the actual election, "so that absentee ballot didn't count."  N.T. Hr'g, 12/15/21, at 45.  Sherrod testified that the members "overwhelmingly" voted for the trustees.  *Id.* at 47; *accord* Exs. P-10, P-12.[10]

---

[8] The parties did not explain why they notified Reverend Reaves if he was no longer the pastor.

[9] Sherrod did not testify about why eight members constituted a quorum.  *See also* N.T. Hr'g, 12/15/21, at 91 (repeatedly testifying that eight votes were needed to elect or reject a trustee).

[10] Exhibit P-10 included 24 ballots.  Each ballot listed four names, with three blank lines

4

With respect to the February 2019 vote to dismiss Reverend Reaves, Sherrod, Glenda Ransom, and Bruce Canady testified that a quorum of members attended the meeting. N.T. Hr'g, 12/15/21, at 56, 156-57 (testifying that in 2019, "the quorum was 13 and there were 19 votes"), 171; *see also* Ex. P-14 (listing 21 signatures on the sign-in sheet). Sherrod and Ransom testified that 19 members voted to dismiss Reverend Reaves. N.T. Hr'g, 12/15/21, at 58, 156.

As for the August 2019 election of trustees, Sherrod also testified that a quorum of members attended the election. *Id.* at 66. Sherrod did not recall how many members attended, but the result of that election was that the four 2018 trustees were reelected. *Id.* at 66-67.

Following the trial, the orphans' court denied Church's petition. Decree, 1/5/22.[11] In support, the orphans' court began by quoting Sherrod's testimony regarding whether a quorum of members was present at each trustees' election. Orphans' Ct. Op. at 10-11.[12] The orphans' court concluded that "there was

for "write-in" candidates, and next to each name or blank line was a "Y" or "N". *See* Ex. P-10.

No witness testified about the actual votes or how to resolve ambiguous votes. Nevertheless, of the 24 ballots, 18 ballots reflect a unanimous vote for the disputed trustees based on discernable "circles" around each "Y". Three ballots reflect a "Y" vote for less than four of the trustees. The remaining ballots had ambiguous markings over the "Y", *e.g.*, handwritten slash marks over the "Y".

Exhibit P-12 was a letter addressed to Brown and Martin stating that 24 "voters voted which gave a majority vote" to the newly elected trustees and that of the 8 "people supporting" Reverend Reaves, only one voted. *See* Ex. P-12. Although Church moved this letter into evidence, the parties did not attempt to harmonize the letter with other evidence and testimony suggesting a different number of votes. Church also moved an April 2019 letter into evidence, which is a letter from Sherrod to the bank. *See* Ex. P-13. In relevant part, it states that "a quorum of the membership" was present at the August 2018 election. *Id.*

[11] The decree was signed on December 28, 2021, and docketed on December 29, 2021, but the Rule 236 notice was given on January 5, 2022 (although the Rule 236 notice itself was also docketed on December 29, 2021). Pa.R.Civ.P. 236.

[12] The orphans' court slightly misquoted the transcript. The orphans' court purports to quote counsel's question as follows: "So how many active members who were eligible to participate in the election were there at that time, 10 roughly?" Orphans' Ct. Op. at 10. The actual

5

no testimony presented at trial as to the exact number of members present" at the disputed elections. *Id.* at 11. Further, the court opined that "the number of members present at the time of either of the purported elections . . . were not equal to or greater than the numbers that were likely required to reach a majority at the time of either election." *Id.*

Specifically, with respect to the August 2018 election, the orphans' court opined that "the number of total votes was 29 or 30 and thus, the number required for a majority vote would have been" either 15 or 16. *Id.* at 11. Per the orphans' court, Sherrod "then testified that the number required to conduct an election in accordance with the Bylaws was 8 votes." *Id.* (cleaned up). The court held that Sherrod's testimony "showed there was an insufficient number of votes to obtain a majority of votes, and thus for the election to have been conducted in accordance with the Bylaws . . . ." *Id.* at 11-12.[13] Church timely appealed and timely filed a court-ordered Pa.R.A.P. 1925(b) statement.[14]

---

transcript reflects that "10" is the line number on the transcript page and was not spoken by counsel. N.T. Hr'g, 12/15/21, at 45. To the extent the misquoted question implied an answer, we correct the typo.

[13] As discussed herein, the orphans' court misstated Sherrod's testimony. For example, Sherrod did *not* testify that the *Bylaws* required eight votes. *See* N.T. Hr'g, 12/15/21, at 45, 91; *see generally* Bylaws. The orphans' court also disregarded or overlooked Sherrod's testimony that "one person came, so that absentee ballot didn't count." Orphans' Ct. Op. at 11 (quoting N.T. Hr'g, 12/15/21, at 45). In other words, the total number of votes was 28 or 29, and not 29 or 30. *Compare* N.T. Hr'g, 12/15/21, at 45, *with* Orphans' Ct. Op. at 11. Finally, in addition to misstating Sherrod's testimony, the orphans' court did not discuss (a) the 2018 election meeting sign-in sheet, which reflects 26 attendees; (b) the existence of 24 ballots; and (c) a majority of those ballots voting in favor of four trustees, *i.e.*, not Brown and Martin.

[14] Church did not have to file a post-trial motion, and entry of judgment was unnecessary. *See* Pa.O.R.C.P. 8.1 (prohibiting post-trial motions to any decree); Pa.R.A.P. 342(a)(8) (explaining that an appeal may be taken as of right from an orphans' court order that complies with Pa.R.A.P. 341). We add that Church filed a motion for reconsideration, which the trial court did not resolve prior to Church's timely appeal.

## II. ISSUES

Church raises three issues. First, whether the orphans' court erred by invalidating the votes at the August 2018 and August 2019 elections for the Board of Trustees. Church's Br. at 4. Second, whether the orphans' court abused its discretion by invalidating, for improper notice, the February 2019 meeting terminating the employment of Reverend Reaves as Church's pastor. *Id.* Third, whether the orphans' court erred by essentially preserving the status quo when equity required overlooking any technical violations of Church's Bylaws. *Id.* at 4-5.

## III. DISCUSSION[15]

### A. The 2018 and 2019 Trustees' Elections

Before summarizing Church's argument, we briefly recap Sherrod's testimony to provide context. Sherrod testified that about 26 or 27 people were present at the August 2018 election. *See* N.T. Hr'g, 12/15/21, at 45; *accord* Ex. P-9 (listing 26 members on the sign-in sheet for the August 2018 meeting); Ex. P-10 (compilation of 24 ballots).

In support of its initial issue, Church begins by assailing the orphans' court's reasoning. Church's Br. at 24. In Church's view, the orphans' court incorrectly found an insufficient number of votes. *Id.* Per Church, the orphans' court relied on a Bylaw that provides that trustees "must be elected annually . . . by a majority vote." *Id.* (citation omitted). Church argues, however, that the Bylaws do not "actually specify the number of votes required in order to elect a trustee." *Id.*

---

[15] We review an orphans' court decree for an abuse of discretion or error of law. *Plance*, 175 A.3d at 260; *see* Pa.R.J.A. 2156(1) (defining matters that orphans' court must resolve); *see also* 20 Pa.C.S. §§ 711(21) (defining jurisdiction of orphans' court as including certain nonprofit corporation matters), 712(3) (defining orphans' court's nonmandatory jurisdiction).

During the pendency of this suit, the General Assembly amended portions of Chapter 57 of Title 15. *See* 15 Pa.C.S. §§ 5701-5793. Church, however, did not request to file any post-submission communications addressing any relevant amendments. *See* Pa.R.A.P. 2501.

7

(cleaned up). Thus, in Church's view, 15 Pa.C.S. § 5757(a)[16] applies, and under Section 5757(a), "a majority of members attending the meeting and participating in the vote" must vote in favor of a trustee. *Id.* at 25.

In that regard, Church acknowledges that the orphans' court primarily relied on Sherrod's testimony. *Id.* In Church's view, however, the orphans' court misconstrued Sherrod's testimony and disregarded the actual ballots that were introduced into evidence. *Id.* at 25-26. Specifically, the court misinterpreted Sherrod's testimony that eight members constituted a quorum, as "somehow" proving "there was an insufficient number of votes" for a majority. *Id.* at 25.

Church then recaps Sherrod's testimony that about 26 or 27 members attended the 2018 election. *Id.* at 26. Per Church, the ballots reflect that "an overwhelming majority of the attendees participated in the vote and voted in favor of the" trustees at issue. *Id.* at 27. Church concedes that there was "less detail" about the 2019 election but maintains that the record establishes a valid majority vote. *Id.* at 27-28.[17] Church concludes that this Court should reverse the orphans' court and recognize the 2018 and 2019 election results as valid. *Id.* at 43.[18]

Initially, it is well settled that courts do not resolve issues of church administration based on "religious doctrine and practice." *Peters Creek United Presbyterian Church v. Washington Presbytery of Pa.*, 90 A.3d 95, 104 (Pa. Cmwlth. 2014) (*en banc*). Rather, we apply a "neutral principles of law approach" to construe church bylaws. *Id.* at 105. We apply this approach only when we can decide the issue by using "purely legal principles without delving into ecclesiastical matters."

---

[16] Section 5757(a) of the Nonprofit Corporation Law of 1988, 15 Pa.C.S. §§ 5101-6162.

[17] Precisely, Church argues the negative: nothing in the record suggests that a majority "did not vote in favor" of the 2019 slate. Church's Br. at 27-28. We add that in Church's view, because the orphans' court's opinion did not reference the 2018 ballots, which were of record, the orphans' court must have overlooked the ballots. *Id.* at 27 n.2.

[18] Reverend Reaves and Brown did not file an appellate brief.

8

*Se. Pa. Synod of the Evangelical Lutheran Church in Am. v. Meena*, 19 A.3d 1191, 1195 (Pa. Cmwlth. 2011) (*en banc*). Our role here is to construe the bylaws of a nonprofit corporation, which just happens to be a church.

In construing church bylaws, we are guided by the rules of statutory construction. *M4 Holdings, LLC v. Lake Harmony Ests. Prop. Owners' Ass'n*, 237 A.3d 1208, 1218 (Pa. Cmwlth. 2020); 1 Pa.C.S. §§ 1901-1991. For example, a court may not insert a word that the drafter "failed to supply into a statute." *Interstate Gas Supply, Inc. v. Pub. Util. Comm'n*, 298 A.3d 1181, 1188 (Pa. Cmwlth. 2023) (*en banc*) (*Interstate*) (cleaned up), *appeal granted* (Pa., No. 292 MAL 2023, filed March 5, 2024); Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 536 (1947) ("One more caution is relevant when one is admonished to listen attentively to what a statute says. One must also listen attentively to what it does not say."). When a bylaw is silent, we may examine the relevant statute governing nonprofit corporations. *See Lutz v. Tanglwood Lakes Cmty. Ass'n*, 866 A.2d 471, 474-75 (Pa. Cmwlth. 2005) (applying the relevant law to affirm the removal of a director of a nonprofit corporation because the bylaws were silent on defining a particular basis for removal).

We briefly recap Church's Bylaws, which do not specify a quorum for non-business meetings, such as meetings to elect a trustee or dismiss a pastor. *See generally* Bylaws. The Bylaws only provide that the trustees must be elected by "aye or nay" vote unless another option, *e.g.*, ballot, was decided. *Id.* at Art. VII(A). The Bylaws are otherwise silent on the minimum number of votes needed to elect a trustee. *See generally* Bylaws. Because the Bylaws are silent, we discuss the relevant nonprofit statutes. *See Lutz*, 866 A.2d at 474-75.

Generally, Title 15 of the Pennsylvania Consolidated Statutes applies to

9

all nonprofit corporations "regardless of the date" of incorporation. 15 Pa.C.S. § 5106(a).[19] Typically, nonprofit corporations have certain powers, which include the election, appointment, and removal of its officers. 15 Pa.C.S. § 5502(a)(16).[20] Chapter 57 of Title 15 addresses officers[21] and members of nonprofit corporations. *Id.* § 5701-5793. "The officers shall be elected or appointed at such time, in such manner and for such terms as may be fixed by or pursuant to the bylaws." *Id.* § 5732(b).

A valid meeting, such as an election, cannot occur "unless a quorum is present." *Id.* § 5756.[22] Absent an applicable bylaw, a "quorum for the purposes of consideration and action on a particular matter at a meeting shall consist of . . . the presence of members entitled to cast at least a majority of the votes that all members are entitled to cast on the matter . . . ." *Id.* § 5756(a)(1)(i).[23] If a quorum of members

---

[19] Section 5106(a) provides that subject to four exceptions, Title 15 "and its amendments are intended to provide uniform rules for the governance and regulation of the affairs of nonprofit corporations and of their officers, directors and members and of members of other bodies, regardless of the date or manner of incorporation or qualification, or of the issuance of any evidences of membership in or shares of a nonprofit corporation." 15 Pa.C.S. § 5106(a).

[20] Section 5502(a)(16) follows: "To elect or appoint and remove officers, employees and agents of the corporation, define their duties, fix their reasonable compensation and the reasonable compensation of directors . . . ." 15 Pa.C.S. § 5502(a)(16); *see also id.* § 5502(a)(19). Subject to various exceptions, a nonprofit corporation's bylaws "may contain . . . provisions for managing the business and regulating the affairs of the corporation not inconsistent with law or the articles." *Id.* § 5504(a).

[21] The definition of "officer" includes "trustee." 15 Pa.C.S. § 5103 (defining the term "officer" as "[i]f a corporation is in the hands of a custodian, receiver, trustee or like official, the term includes that official or any person appointed by that official to act as an officer for any purpose under this subpart"). We do not address whether the statutory term "trustee" is equivalent to how Church uses the term.

[22] "A meeting of members of a nonprofit corporation duly called shall not be organized for the transaction of business unless a quorum is present." 15 Pa.C.S. § 5756(a).

[23] We quote Section 5756(a)(1) as follows:

**(a) General rule.**—A meeting of members of a nonprofit corporation duly called shall not be organized for the transaction of business unless a quorum is present. Unless otherwise provided in a bylaw adopted by the members:

10

is present at a meeting, then Section 5757 defines a valid vote: in the absence of an applicable bylaw, "whenever any corporate action is to be taken by vote of the members of a nonprofit corporation, it shall be authorized upon receiving the affirmative vote of a majority of the votes cast by the members entitled to vote thereon . . . ." *Id.* § 5757(a). In other words, if the bylaws are silent, then a valid meeting, *i.e.*, election, requires the presence of a majority of the organization's members. *See id.* § 5756; *see also Stryjewski v. Panfil*, 112 A. 764 (Pa. 1921).[24]

Instantly, we agree with Church's criticism of the orphans' court's reasoning. For example, the orphans' court quoted Sherrod's testimony that 26 or

> (1) A quorum for the purposes of consideration and action on a particular matter at a meeting shall consist of:
>> (i) the presence of members entitled to cast at least a majority of the votes that all members are entitled to cast on the matter; and
>> (ii) if any members are entitled to vote as a class on the matter, the presence of members entitled to cast at least a majority of the votes entitled to be cast in the class vote.

15 Pa.C.S. § 5756(a)(1)(i)-(ii).

[24] The parties did not cite *Stryjewski*, in which the church constitution provided that "[a]ll of the members of the parish can discharge on a special meeting their parish priest . . . ." *Stryjewski*, 112 A. at 764. Church members were notified of a meeting to discharge the priest. *Id.* Of the 53 members present for the vote to dismiss the priest, 40 voted in favor and 2 voted against. *Id.* at 765. Per the *Stryjewski* Court, the "church constitution [was] silent on the question of a quorum." *Id.* The church board ratified the vote and the priest was notified of his dismissal, but he refused to vacate the premises, which resulted in a lawsuit. *Id.*

Our Supreme Court construed the church constitution as permitting the majority of attendees that attended the meeting to vote out the priest. *Id.* (construing the phrase "all of the members of the parish" as signifying "that such action must be had by the congregation at large and not by the official board, or by any other body less than the membership, and that all shall have opportunity to participate—not that all must attend the meeting, or every one vote in the affirmative. To so hold would practically prevent all action, as it would rarely happen that every member of the church could or would attend, or that all would be of one mind. Were that necessary, no priest could be discharged so long as he had one friend in the church." (citation omitted)). The *Stryjewski* Court held that because the "meeting was largely attended, and more than one-half of the entire membership remained when the [proposal to dismiss the priest was] acted upon; so there is no question as to the presence of a quorum" to dismiss the priest. *Id.* The Court validated the 40 votes even though the 40 votes cast were "less than a majority of the entire membership." *Id.*

27 people were present at the August 2018 election, which, per Sherrod, exceeded the quorum of 8. Orphans' Ct. Op. at 10-11. Nevertheless, the orphans' court inexplicably stated "there was no testimony presented at trial as to the exact number of members present" at the August 2018 election. *Id.* at 11. But Sherrod testified that 26 or 27 members were present at the August 2018 election, which is corroborated by the 26 signatures on the sign-in sheet for the meeting. *See* Ex. P-9.

Relatedly, it is unclear why the orphans' court focused only on Sherrod's testimony in finding that there was "an insufficient number of votes to obtain a majority of votes," which "would have been 15 . . . or 16 votes . . . ." Orphans' Ct. Op. at 11-12.[25] The orphans' court did not acknowledge the ballots moved into evidence or explain why they should be discredited. The 24 ballots reflect at least 18 unanimous votes in favor of the trustees, which exceed the 15 or 16 votes needed for a majority, per the orphans' court. *Compare id.*, *with* Ex. P-10 (ballots). Because the orphans' court's opinion (1) is internally contradictory, and (2) contradicts unaddressed evidence of record, we vacate the decree below and remand with instructions, as set forth in our order below.

### B. Notice of Termination of Employment

Although we vacate the orphans' court decree and remand with instructions, we are compelled to observe the following regarding Church's second issue. To briefly recap, the Bylaws provide that the reverend's "term of office may be ended upon ninety (90) days['] notice on the part of the Pastor or the Church." Bylaws, at Art. II(C. Termination of Pastorate). The orphans' court, however, summarily held that the above term requires 90 days' advance notice of the *meeting*

---

[25] As discussed herein, because one absentee ballot was excluded, it appears the total number of votes was actually 28 or 29, which would indicate a majority of 15. *Compare* N.T. Hr'g, 12/15/21, at 45, *with* Orphans' Ct. Op. at 11.

to dismiss Reverend Reaves. Orphans' Ct. Op. at 15 (stating "the testimony presented was that approximately a [week's] notice was given, or 7 days. Thus, the [c]ourt could not confirm the termination of the pastor following the trial as notice was not given at least ninety (90) days in advance").

On appeal, Church emphasizes the orphans' court's lack of any supporting reasoning. In support, Church asserts that such contractual notice provisions "are routinely interpreted to require notice *after* a decision to terminate an employee . . . ." Church's Br. at 30 (citing *Shaer v. Orthopaedic Surgeons of Cent. Pa., Ltd.*, 938 A.2d 457 (Pa. Super. 2007)).[26] Because the orphans' court "sole basis" for invalidating the vote dismissing Reverend Reaves was the 90 days' notice clause, Church requests that we reverse.

In *Shaer*, the parties disputed a similar notice provision, specifically whether the parties' employment contract required the employer to provide the employee "with ninety days' notice upon its decision to terminate him, rather than the thirteen days' notice" by the employer. *Shaer*, 938 A.2d at 462. In resolving the issue, the *Shaer* Court noted that "the ninety-day notice period was intended to benefit both parties." *Id.* at 465. "Regardless of who terminated the arrangement and whether or not it was amicable," the notice clause provided that the employee would work during the 90-day notice period. *Id.* In exchange, the employer would guarantee the employee's employment, salary, and benefits for 90 days. *Id.* Thus, the employer violated the contract by terminating the employee's employment prior to 90 days. *Id.*[27]

_____

[26] We may discuss Superior Court cases for their persuasive value. *Marshall v. Se. Pa. Transp. Auth.*, 300 A.3d 537, 541 n.2 (Pa. Cmwlth. 2023).

[27] *Shaer* was cited in one treatise. Williston on Contracts § 54:49 (2023). In relevant part, Section 54:49 notes that a notice clause "providing for two weeks' written notice of termination" ensures that the "employee is assured of the benefits of the contract for at least the prescribed period after notice is given." *Id.* (footnote omitted).

Instantly, the orphans' court cited no caselaw in support of its novel interpretation of a typical notice provision. *See, e.g.*, *id.* In contrast, the orphans' court interpretation apparently requires us to add the term "of the meeting" into the Bylaws, which is ordinarily barred by the rules of construction. *See Interstate*, 298 A.3d at 1188. Although we vacate the decree and remand for further proceedings, we would hold that the orphans' court erred as a matter of law.[28]

## IV. CONCLUSION

For these reasons, we vacate the orphans' court's January 5, 2022 decree. Because (1) some of the orphans' court's findings were unsupported by competent and adequate evidence of record; and (2) the orphans' court's reasoning is internally inconsistent and contradictory, we respectfully remand to have the orphans' court reissue its decree and opinion with findings of fact that cite to evidence of record and consistent reasoning.[29] The orphans' court's decree and opinion must also address the trial exhibits, including the sign-in sheet for the 2018 election, *see* Ex. P-9, and resolve whether the members present for the 2018 election constitute a quorum.

LORI A. DUMAS, Judge

---

[28] As noted herein, the trustees and deacons allegedly ratified the vote terminating the Reverend's employment. But the orphans' court invalidated the pertinent election of the trustees.

[29] The orphans' court's opinion quoted or paraphrased from the pleadings for some of its apparent findings of fact. *See Plance*, 175 A.3d at 259 (stating that the orphans' court's findings must be "supported by competent and adequate evidence" of record). Because the orphans' court decision generally did not cite to evidence of record, appellate review was hampered. Finally, because of our disposition, we do not address Church's third issue.

14

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: New Central Baptist : 
Church, Non Profit Organization : No. 1079 C.D. 2022
 :
Appeal of: New Central Baptist :
Church :

# **O R D E R**

AND NOW, this 22nd day of March, 2024, we VACATE the January 5, 2022 decree entered by the Court of Common Pleas of Philadelphia County, Orphans' Court Division. We REMAND for further proceedings. The orphans' court is directed to reissue its decree and opinion with findings of fact citing to evidence of record and consistent reasoning. The orphans' court's decree and opinion, in addition to resolving all outstanding claims, must also address the trial exhibits and resolve whether the members present for the 2018 election constitute a quorum. Jurisdiction relinquished.

_____
LORI A. DUMAS, Judge